Sandra **DEASE**, d/b/a the **Wounded Knee Saloon,** Plaintiff,

v.

**CITY OF ANAHEIM,** Defendant.

No. CV–93–1712 RG (SX).

United States District Court, C.D. California.

July 8, 1993.

G. Randall Garrou, Weston, Sarno, Garrou & DeWitt, Beverly Hills, CA, for plaintiff.

Mark S. Gordon, Office of City Atty., Anaheim, CA, for defendant.

### MEMORANDUM DECISION & JUDGMENT

GADBOIS, District Judge.

Having considered all of the evidence submitted, the trial briefs, and all other moving and opposition papers and arguments of counsel, the Court makes the following findings of fact and rulings of law:

### I. Factual Background

Plaintiff Sandra Dease and her husband have owned and operated the Wounded Knee Saloon ("the Wounded Knee"), located at 815 Brookhurst Street in the city of Anaheim ("the City"), since June 1991. Prior to the Plaintiff's purchase of the Wounded Knee, it operated at this location for several years, at times featuring "wet t-shirt contests" and bikini-clad females engaged in "whipped-cream wrestling contests." Prior to the initiation of this lawsuit, entertainment at the Wounded Knee allegedly consisted of exotic/erotic dancing by bikini-clad (non-nude) dancers.

The Plaintiff states that when she purchased the Wounded Knee, she planned to feature topless dancing and hold occasional wet t-shirt contests and bikini-whipped-cream-wrestling events. However, in a meeting held on July 25, 1991, City officials allegedly told the Plaintiff that if she featured any of these forms of entertainment at the Wounded Knee, they would "close her up." Dease Declaration at ¶ 7. On September 24, 1991, the Plaintiff received a letter from the City stating that her application for an entertainment permit had been denied to the extent that she sought permission to conduct whipped-cream wrestling, wet t-shirt contests, and bikini clad dancing and/or waitressing at the Wounded Knee. Dease Declaration, Exhibit A. After negotiations with the Plaintiff's attorney, the City modified its ruling on the Plaintiff's application for an entertainment permit on October 11, 1991, allowing her to exhibit "bikini dancers" at the Wounded Knee.[1] Dease Declaration, Exhibit B. The City's approval of bikini dancing specifically prohibits such dancers from exposing any "specified anatomical areas" as defined in § 18.89.020.030 of the Anaheim Municipal Code ("A.M.C.").

The Plaintiff claims that the City's restrictions on entertainment at the Wounded Knee have caused her business to decline precipitously. At the time the Plaintiff filed her Complaint, the Wounded Knee had ceased operations during daytime hours, and several employees had quit, due to lack of income from tips. The Plaintiff states that she would have closed the Wounded Knee pending the district court's ruling on her motion for a preliminary injunction, had her attorney not advised against it.[2] Supplemental Dease Declaration at ¶¶ 8–9. Based on the Plaintiff's experience in the erotic dancing industry and the feedback she has received from her customers, the Plaintiff believes that business would increase at the Wounded Knee if it were allowed to feature nude[3] or topless dancing, or dancing in g-strings and pasties. However, if the Plaintiff's employees perform in this manner, the Wounded Knee will be subject to prosecution for operating as an Adult Entertainment Business ("AEB") without a Conditional Use Permit ("CUP"), as specified in A.M.C. § 18.89.030.-010. The Plaintiff has never applied for a CUP.

## II. Procedural History

On March 19, 1993, the Plaintiff filed a Complaint against the City. The Complaint alleges that the Anaheim CUP ordinance suffers from two constitutional infirmities: (1) *facial* invalidity, on the grounds that it constitutes an impermissible prior restraint on free speech in violation of the First and Fourteenth Amendments to the United States Constitution and Article 1, § 2 of the California Constitution; and (2) *as applied* invalidity under these same constitutional provisions, due to the imposition of zoning restrictions that allegedly deprive the AEB owners of a reasonable opportunity to find a viable site for their businesses in Anaheim.

On March 29, 1993, the Plaintiff made an ex parte application for a temporary restraining order ("t.r.o.") and a preliminary injunction to enjoin enforcement of the CUP ordinance. This motion was solely based on the facial constitutional challenge. The district court denied the Plaintiff's request for a t.r.o. but granted the motion for a preliminary injunction. *See* Order entered April 21, 1993. Pursuant to Fed.R.Civ.P. 42(b) and 65(a)(2)[4], the parties agreed to an expedited

1. Dease attests that she has received notice from the City (dated February 19, 1993) that her application to renew her entertainment permit (dated July 13, 1992) would be denied. Dease is currently pursuing an administrative appeal of this decision. Dease Declaration at ¶ 29.

2. Randall Garrou, the Plaintiff's attorney, advised her that, if the Wounded Knee shut down completely, the City might revoke its permit(s) due to an alleged discontinuance of a lawful nonconforming use.

3. If the Wounded Knee featured nude dancing, rather than topless dancing or dancing in g-strings and pasties, it could not serve alcohol to its customers. Cal.Admin.Code § 143.3. This law was upheld by the United States Supreme Court in *California v. La Rue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

4. Fed.R.Civ.P. 42(b) provides, *inter alia*, that the court "may order a separate trial of any claim ... or of any separate issue," if doing so will further convenience, avoid prejudice, or will be conducive to expedition and economy.

non-jury trial on the merits of the Plaintiff's facial invalidity claim. *See* Order entered April 19, 1993. The parties submitted supplemental evidence and briefing to the court, and this judgment reflects the court's ruling on the issue of whether the Anaheim CUP ordinance is facially unconstitutional.

### III. The Anaheim CUP Ordinance

If the Wounded Knee were to feature nude or semi-nude dancing, it would be classified as a "cabaret" under A.M.C. § 18.89.020(H)[5], the portion of the Anaheim Municipal Code defining AEB's. A.M.C. § 18.89.030 specifies that all AEB's must meet the following CUP requirements:

.010—[N]o person shall establish, conduct, operate, or maintain any 'adult entertainment business' ... on any property in the City of Anaheim without having first obtained a conditional use permit therefor pursuant to the provisions of Chapter 18.03 of this title.

.020—[N]o conditional use permit shall be granted by the City of Anaheim for any such "adult entertainment business" if the premises upon which such business is proposed to be located is:

A. Within 400 feet of any lot zoned for residential use; or

B. Within 1000 feet of any lot upon which there is located a church, or educational institution utilized by minors; or

C. Within 1000 feet of any lot upon which there is located any other Adult Entertainment Business as defined in Section 18.89.020 of this chapter.

An AEB located in an area that satisfies the distance requirements set forth in A.M.C. § 18.89.030.020 does not automatically qualify for a CUP. The decision to grant or deny the issuance of a CUP is left in the hands of Anaheim Planning Commission, whose decision-making is guided by the following criteria, as set forth in A.M.C. § 18.03.030.020:

The Planning Commission, as an administrative act, *may* grant conditional use permits for any use hereinafter provided for, if the conditions and standards set forth herein are satisfied. In granting any such conditional use permit the Planning Commission *may* establish such conditions *as it may determine to be reasonably necessary to safeguard and protect the public health and safety and promote the general welfare* and to insure the development of any use authorized in accordance with approved plans.

(emphasis added).

This section further specifies that, before the Planning Commission can issue a CUP, it must find that the proposed use will not (1) "adversely affect the adjoining land uses and the growth and development of the area" (subsection .032); (2) be detrimental to the "peace, health, safety, and general welfare" of the area (subsection .033); (3) create an undue burden by generating excess traffic (subsection .034); or (4) "be detrimental to the peace, health, safety, and general welfare of the citizens of the City of Anaheim" (subsection .035). The Plaintiff claims that this ordinance is unconstitutional in that it grants excessive substantive discretion to city officials in deciding whether to grant or deny a CUP.

On December 15, 1992, the City amended the CUP ordinance, stating that "a court action has been brought against the City alleging constitutional invalidity of portions of Chapter 18.03 as applied to AEB's and seeking a preliminary and a final injunction against its enforcement." Ordinance No. 5346 § 6(1).[6] To protect the CUP ordinance

---

Fed.R.Civ.P. 65(a)(2) allows for consolidation of a preliminary injunction hearing with a trial on the merits. Rule 65(a)(2) further specifies that, at trial, "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits" automatically becomes part of the trial record and need not be repeated.

**5.** A "cabaret" is defined as a "nightclub, theater or other establishment which features live perfor-

mances by topless and/or bottomless dancers, 'go-go' dancers, exotic dancers, strippers, or similar entertainers, where such performances are distinguished or characterized by an emphasis on 'specified sexual activities' or 'specified anatomical areas.'"

**6.** At the hearing on the t.r.o., both parties indicated that this litigation has been resolved.

from being found constitutionally invalid, the City added the following provisions to A.M.C. § 18.03.030:

.037—[A] conditional use permit *shall* be granted by the City Council or Planning Commission ... for any use which consists essentially of dissemination of information or other *speech or expression protected by the First Amendment* to the United States Constitution, *unless* the information submitted by the applicant and/or presented at the public hearing substantiates one or more of the following findings:

.03701 that the requested use at the proposed location will adversely affect the use of a church, temple, or other place used exclusively for religious worship, school, park, or playground ...; or

.03702 that the requested use ... is insufficiently buffered in relation to residentially zoned areas within the immediate vicinity ...;

.03703 that the exterior appearance of the structure will be inconsistent with the external appearance of commercial structures already constructed or under construction ... so as to cause blight or deterioration, or substantially to diminish or impair property values within the neighborhood;

.03704 that any one or more of the requirements of subsections .031 through .034 of this Section are not met.

The uses to which this subsection applies include, but are not necessarily limited to, sale or rental of books, periodicals, audiotapes or videotapes, and live or recorded theatrical or musical performances such as motion pictures, speaking, pantomime, singing or dancing, or any combination thereof, before an audience.

(emphasis added).

## IV. Legal Analysis

### A. Standing

■ The Plaintiff has never applied for a CUP permit; hence she is challenging the constitutionality of the law on its face. Facial challenges to legislation are generally disfavored. However, the Supreme Court has recognized that "[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates broad licensing discretion to an administrative office, whether or not [her] conduct could be proscribed by a properly drawn statute, and whether or not [she] applied for a license." *Lakewood v. Plain Dealer Co.*, 486 U.S. 750, 756, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988) (quoting *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965)); *see also Forsyth County v. Nationalist Movement*, —— U.S. ——, ——, 112 S.Ct. 2395, 2400, 120 L.Ed.2d 101, 110 (1992); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990); *Gaudiya Vaishnava Soc'y v. City of San Francisco*, 952 F.2d 1059, 1062 (9th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). Therefore, the Plaintiff has standing to challenge the ordinance, regardless of whether she has applied for or would qualify for the CUP.

### B. Constitutional Limitations on Zoning

The Supreme Court has recognized that local governments have a broad range of authority within which to regulate the growth and development of their communities through zoning. However, the Court has also held that, like any other law, a zoning ordinance cannot exceed the boundaries of the Constitution:

The power of local government to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it must be exercised within constitutional limits. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981).

### 1. Nude or Semi–Nude Dance as Erotic Speech under the First Amendment

■ The Plaintiff has stated that, were she unrestrained by the Anaheim CUP ordinance, she would present nude or semi-nude (topless dancing or dancing in g-strings and

pasties) dancing as a form of entertainment at the Wounded Knee. Although it can be argued that these types of activities are not entitled to the same level of protection as political or "pure" speech, the Supreme Court has recognized that nude or semi-nude dance is a form of expression that falls within the parameters of the First Amendment[7]:

> Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. Nor may an entertainment program be prohibited solely because it displays the nude human figure. Nudity alone does not place otherwise protected material outside the mantel of the First Amendment. Furthermore, ... nude dancing is not without its First Amendment protections from official regulation.

*Schad,* 452 U.S. at 65–66, 101 S.Ct. at 2181 (on grounds of. overbreadth, striking down zoning ordinance prohibiting live entertainment, including nude dancing); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) (on grounds of overbreadth, striking down local ordinance barring waitresses, barmaids, and entertainers from appearing topless); *BSA, Inc. v. King County,* 804 F.2d 1104, 1107 (9th Cir.1986) (ordinance banning "common barroom nude dancing" violates First Amendment); *Chase v. Davelaar,* 645 F.2d 735 (9th Cir.1981) (on grounds of overbreadth, striking down ordinance prohibiting topless entertainment in all nontheatrical establishments selling food or beverages); *cf. Barnes v. Glen Theatre, Inc.,* 501 U.S. ——, ——, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504, 511 (1991) (plurality opinion) ("[N]ude dancing ... is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."). The California Su-

preme Court has also held that laws banning nude dancing violate the First Amendment. *See Morris v. Municipal Court,* 32 Cal.3d 553, 652 P.2d 51, 186 Cal.Rptr. 494 (1982).

### 2. Content–Based Restrictions on Speech

▮ Because nude/semi-nude dance is a form of expression protected by the First Amendment, the government cannot regulate the speech element of this activity on the basis of its *content.* The Constitution prohibits content-based regulation so that the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48–49, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). Therefore, if a "time, place, and manner" restriction on speech is based solely on the content of that speech, it presumptively violates the First Amendment. *Id.* at 46–47, 106 S.Ct. at 928; *see also Carey v. Brown,* 447 U.S. 455, 462–63 & note 7, 100 S.Ct. 2286, 2191 & note 7, 65 L.Ed.2d 263 (1980). However, *content-neutral* time, place, and manner restrictions "are acceptable so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton,* 475 U.S. at 47, 106 S.Ct. at 928; *see also City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Clark v. Comm. for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).[8]

### 3. Content–Neutral Time, Place, and Manner Restrictions

In *Renton,* the Supreme Court upheld a zoning ordinance that prohibited "adult"

---

7. The City of Anaheim has not alleged that the nude or semi-nude dancing at issue in this case constitutes material that is legally "obscene." Obscenity is not protected by the First Amendment. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Nudity alone is insufficient to make entertainment legally obscene. *See Jenkins v. Georgia,* 418 U.S. 153, 161, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).

8. Although the "time, place, and manner" test was developed to evaluate restrictions on expression taking place in a public forum (e.g., a sidewalk), the Supreme Court has also applied this test to conduct occurring on private property. *See Barnes,* 501 U.S. at —— – ——, 111 S.Ct. at 2460–61, 115 L.Ed.2d at 511–12; *Renton,* 475 U.S. at 62, 106 S.Ct. at 936.

movie theatres from locating within 1000 feet of any residential zone, single or multiple family dwelling, a church, a park, or a school. The Court found that the ordinance was not aimed at the *content* of the films, but rather at the *secondary effects* of such theaters. *See also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding similar ordinance).

Applying a similar analysis, the Supreme Court in *Barnes* held that "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech elements can justify incidental limitations of First Amendment freedoms." 501 U.S. at ——, 111 S.Ct. at 2461, 115 L.Ed.2d at 512. The Court upheld an Indiana "public indecency statute" banning public nudity, even though the ordinance had the effect of prohibiting all nude dancing.[9] In *Barnes,* the Court reasoned that, while nude dancing may embody some element of "speech" by conveying an erotic message, other aspects of the performance were subject to governmental regulation. The Court found that the Indiana law was intended to further a "substantial government interest in protecting order and morality," an interest unrelated to the suppression of free expression. *Id.* 501 U.S. at ——, 111 S.Ct. at 2462, 115 L.Ed.2d at 513.

In analyzing the Indiana law, the Supreme Court applied the test first articulated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (applying First Amendment analysis to burning of draft card). Under this test, government regulation of an activity combining speech and nonspeech elements is "sufficiently justified" if the following four conditions are met:

(1) it is within the constitutional power of the government;

(2) it furthers an important or substantial governmental interest;

(3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the government interest.

*O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1679; *see also Barnes,* 501 U.S. at ——, 111 S.Ct. at 2461, 115 L.Ed.2d at 512.

 It is clear that the City has the constitutional power to enforce zoning regulations, so long as they are designed to further a "substantial government interest"[10] that is "unrelated to the suppression of freedom of expression." If an ordinance infringes upon a protected liberty (in this case, freedom of speech), the incidental restriction must be "no greater than is essential to the furtherance of the government interest."

### 4. Prior Restraints

In determining the constitutionality of the Anaheim CUP ordinance, the court must engage in a second level of analysis beyond the *O'Brien* test and deal with the issue of prior restraints. Unlike the statute at issue in *Barnes,* which simply bans public nudity, the Anaheim CUP ordinance acts as a "prior restraint" on speech. The Anaheim permit scheme qualifies as a prior restraint, because it essentially requires the permittee to obtain the government's permission or approval before engaging in an act of speech. The key issue in this case is whether the Anaheim CUP ordinance constitutes a "*content-neutral,* time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses," or whether it is more properly characterized as an unconstitutional prior restraint on free speech. *FW/PBS,* 493 U.S. at 223, 110 S.Ct. at 603.

 Although prior restraints are not unconstitutional per se, "any system of prior restraint ... [bears] a heavy presumption against its constitutional validity." *FW/PBS,* 493 U.S. at 225, 110 S.Ct. at 604. The Plain-

---

**9.** Semi-nude dancing is allowed under the Indiana law.

**10.** Local governments have a "substantial government interest" in controlling land use through zoning. However, in the instant case the City has presented no specific evidence demonstrat-

ing that harmful effects are associated with AEB's. Likewise, the City has produced no evidence linking illegal activity (other than alleged violation of the CUP zoning laws) with the Wounded Knee Saloon.

tiff argues that the Anaheim CUP ordinance is an unconstitutional prior restraint, because (1) it confers excessive *substantive* discretion on city officials to decide whether to grant or deny a CUP, and (2) it does not provide adequate *procedural* safeguards, due to the fact that the process for obtaining a CUP may extend for over one hundred days.

 Because the court concludes that the Anaheim CUP ordinance places an unconstitutional level of substantive discretion in the hands of city officials, the court does not reach the issue of whether the CUP ordinance lacks adequate procedural safeguards. The Supreme Court has identified the dangers of an "unbridled licensing scheme" as (1) self-censorship by the potential permittee, undertaken to avoid being denied a license to speak; and (2) the difficulty of "effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the censor's action." *Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145. In other words, a system that endows a government official with "unbridled discretion" to determine "who may speak and who may not" implicitly vests that government official with the power to regulate speech on the basis of its content and/or the viewpoint of the speaker. *Id.,* 486 U.S. at 763, 108 S.Ct. at 2147. For this reason, the Supreme Court has repeatedly held that an ordinance "which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS,* 493 U.S. at 226, 110 S.Ct. at 605 (citing *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969)). Addressing the constitutionality of a parade permit requirement, *Shuttlesworth* held that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." 394 U.S. at 150–151, 89 S.Ct. at 938; *see also Forsyth County, supra* (regulating fee for parade permits); *Freedman, supra* (censorship of motion pictures); *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) (labor activity; permit required to solicit members for organization requiring payment of dues).

Before the Anaheim Planning Commission may grant a CUP, it must find that the proposed use will not be detrimental to the "peace, health, safety, and general welfare" of the area. A.M.C. § 18.03.030.033. Additionally, the ordinance provides that the Planning Commission may establish "such conditions as it may determine to be reasonably necessary to safeguard and protect the public health and safety and promote the general welfare" to regulate the issuance of CUP's. A.M.C. § 18.03.030.020. For uses designated by the Planning Commission to be protected by the First Amendment, the ordinance states that the CUP shall be granted unless the Planning Commission determines that it will "adversely affect" the use of a church, school, park or playground; is "insufficiently buffered" in relation to residential areas; or its exterior appearance is "inconsistent" with the appearance of external structures in the neighborhood. A.M.C. § 18.03.030.037.

The City argues that zoning requirements must be somewhat vague. For example, the City contends that "it is quite possible that an adult business might meet the minimum locational criteria of Chapter 18.89 but still be inappropriate in a particular location." Opposition to Motion for Preliminary Injunction at 14. For this reason, the City claims that it cannot rely on objective standards in its decision to grant or deny a CUP.

In *Staub,* the Supreme Court struck down a law which predicated the issuance of a permit on whether the mayor and the city council determined that the proposed use would adversely affect the "general welfare" of the citizenry. 355 U.S. at 322, 78 S.Ct. at 282. Similarly, in *Shuttlesworth* the relevant statute provided that the government official would refuse to issue the permit if the proposed use threatened "the public welfare, peace, safety, health, decency, good order, morals, or convenience" of the community. 394 U.S. at 149, 89 S.Ct. at 938. The Court found that this ordinance vested "virtually

unbridled and absolute power" in the City Commission, and consequently held that it was unconstitutional. *Id.* at 150, 89 S.Ct. at 938.

The Anaheim CUP ordinance vests the Planning Commission with the power to decide who may or may not obtain a CUP. Because the Commission's decision-making is not guided by definite and objective standards, the CUP ordinance infringes the First Amendment rights of the permittee. The Commission's ability to make decisions based on ambiguous criteria such as the "general welfare" of the community effectively gives the Commission the power to make decisions on any basis at all, including an impermissible basis, such as content-based regulation of speech. Judging the ordinance as it is now written, this court cannot conclude that the Anaheim ordinance "serves a substantial government interest *unrelated to the suppression of freedom of expression.*" *BSA, Inc.,* 804 F.2d at 1107 (emphasis added); *see also Barnes,* 501 U.S. at ——, 111 S.Ct. at 2461, 115 L.Ed.2d at 512.

The "First Amendment" section of the Anaheim ordinance does not cure its constitutional infirmities. The ambiguity of this subsection also gives the Planning Commission an unconstitutional amount of discretion in deciding whether to grant or deny the CUP, leaving open the possibility of content-based discrimination.[11] The Planning Commission may refuse to issue a CUP, based on vaguely-worded criteria such as the following: (1) no First Amendment activity may occur in an area that may "adversely affect" a school or church, or (2) no First Amendment activity may take place in an area that is "insufficiently buffered" in relation to a residential zone. While this court respects the City's

good faith attempt to protect First Amendment interests, as a matter of law the City has failed to do so.

## 5. Void for Vagueness

In addition to challenging the Anaheim CUP ordinance as a prior restraint, the Plaintiff also claims that part of this ordinance is void for vagueness. A.M.C. § 18.-89.030.020 specifies that no CUP shall be granted to an AEB located within 400 feet of a lot zoned for residential use, or within 1000 feet of another AEB as defined in A.M.C. § 18.89.020. The Plaintiff argues that this portion of the CUP ordinance is unconstitutionally vague, on the following grounds: (1) it does not specify whether an AEB may be located within 400 feet of a residential area outside the city limits of Anaheim; and (2) it does not specify whether the term "AEB" only applies to businesses currently possessing a CUP.

The void for vagueness doctrine demands that laws be written so that they "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he· may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). In this case, the Anaheim CUP ordinance can be interpreted by the plain meaning of its words. The term "any lot zoned for residential use" necessarily includes all residential areas, regardless of whether they are located within the city of Anaheim. *See* A.M.C. § 18.89.030.020(A). Likewise, "any other Adult Entertainment Business as defined in Section 18.89.020 of this chapter" only includes those AEB's that are licensed as such by the city of Anaheim. *See* A.M.C.

---

**11.** Although this portion of the CUP ordinance identifies several activities to which it applies, it also covers uses "which consist[ ] essentially of dissemination of information or other speech or expression protected by the First Amendment." The list of activities includes the following: sale or rental of books, periodicals, audiotapes or videotapes, and live or recorded theatrical or musical performances such as motion pictures, speaking, pantomime, singing or dancing. It appears that the First Amendment section of the ordinance directly applies to AEB applicants for a CUP (including the Plaintiff). However, the City has also argued that the "speech" embodied

in erotic dance is entitled to only the most minimal First Amendment protection.

By leaving the determination of what constitutes a "First Amendment use" in the hands of the Planning Commission, the ordinance may (1) fail to give some permit applicants proper notice of whether they fit into this category, and (2) give the Planning Commission an unconstitutional realm of discretion within which to make this decision. *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. ——, —— n. 19, 113 S.Ct. 1505, 1513 n. 19, 123 L.Ed.2d 99, 112 n. 19 (1993).

§ 18.89.030.020(C). The court concludes that this portion of the CUP ordinance is not unconstitutionally vague.

## C. Severability

 "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987); *see also Regan v. Time, Inc.,* 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion). A constitutionally flawed provision cannot be severed "if the balance of the legislation is incapable of functioning independently." *Alaska Airlines,* 480 U.S. at 684, 107 S.Ct. at 1480.

In the instant case, the court has found that the conditions for obtaining a CUP under A.M.C. § 18.89.030 are unconstitutional. Consequently, all other statutory references to the CUP ordinance are effectively rendered moot. For example, even though A.M.C. § 18.89.030.020 [12] is not unconstitutionally vague, it cannot stand on its own if the conditions for obtaining the CUP itself are unconstitutional. Because the unconstitutional aspects of the Anaheim CUP ordinance are inherent in the scheme itself, they cannot be severed. Therefore, all references to the Anaheim CUP licensing requirement must be stricken from the Anaheim Municipal Code.

## V. Conclusion

The Constitution permits the City of Anaheim to protect its communities from the secondary effects associated with adult entertainment businesses, such as the one owned by the Plaintiff in this case. The City may also use zoning as a means to accomplish this end. However, the Constitution does not allow the City to regulate these types of businesses on the basis of the content of their speech—i.e., the City cannot deny a CUP application for an establishment exhibiting nude dancing on the grounds that the City finds nude dancing to be offensive and of little value.

When a zoning ordinance requires the issuance of a license or a permit before the applicant can engage in an act of speech, the licensing authority must be guided by objective and definite standards. Otherwise, the possibility of content-based censorship is inherent in the statute. Because the Anaheim CUP ordinance does not adequately control the licensor's discretion, it violates the First Amendment to the United States Constitution.

**IT IS SO ORDERED.**

---

12. A.M.C. § 18.89.030.020 mandates that no CUP will be issued to an AEB located within 400 feet of a residential area, 1000 feet of a church or school, or within 1000 feet of another AEB.