[No. G020502. Fourth Dist., Div. Two. June 29, 1999.]

BADI ABRAHIM GAMMOH, Plaintiff and Appellant, v.
CITY OF ANAHEIM, Defendant and Respondent.

**COUNSEL**

Roger Jon Diamond for Plaintiff and Appellant.

Rutan & Tucker and Jeffrey A. Goldfarb for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—This "adult cabaret" zoning case in state court begins with another such case involving the same city that was decided in federal court. In *Dease* v. *City of Anaheim* (C.D.Cal. 1993) 826 F.Supp. 336, the local federal district court struck down Anaheim's conditional use permit zoning ordinance for "adult entertainment."[1] The sin of Anaheim's ordinance, according to the *Dease* decision, was that it was not a true zoning ordinance,

---

[1]The establishment which the plaintiff, Badi Abrahim Gammoh, seeks to open would offer "exotic strip tease." Generally, euphemisms obstruct clear thinking about a subject, and the phrases "adult cabaret" and "adult entertainment" have a euphemistic feel to them. "Cabaret" in particular is problematic. We doubt that Gammoh plans to build his enterprise around the sort of images of Weimar Republic decadence and Marlene Dietrich kitsch that are often associated with the word "cabaret." The Oxford English Dictionary, after all, defines "cabaret" in relatively nonsexual terms—a "drinking house" or "restaurant or night-club in which entertainment is provided as an accompaniment to a meal; also, the so entertainment provided, a floor-show." (See II Oxford English Dict. (2d ed. 1989) p. 745.) "Strip joint" would probably be a more accurate phrase for Gammoh's planned business, but that phrase has an unnecessary judgmental and pejorative flavor, albeit not a euphemistic one. To use the phrase "strip joint" would create a bias in favor of the city's position from the beginning of one's analysis, and perhaps be substantively unfair to the plaintiff: What law of nature, for example,

but a prior restraint on free speech because it invested the Anaheim Planning Commission with excessive substantive *discretion* as to whether a proposed permit would be granted. The court said: "The Anaheim permit scheme qualifies as a prior restraint, because it essentially requires the permittee to obtain the government's permission or approval before engaging in an act of speech." (*Id.* at p. 342.)

In the wake of *Dease*, Anaheim redrafted its adult entertainment zoning ordinance to eliminate its discretionary features. The new ordinance actually *required* a permit to be granted if the adult cabaret operator could satisfy certain objective criteria, the most important of which, for this case, was that the cabaret could not be within 400 feet of any area zoned residential.

The plaintiff in this case, Badi Abrahim Gammoh, leased property in an industrial section of Anaheim just off the Riverside Freeway (SR 91), planning to open a cabaret under the name of the "Funtease" theater. In his reply brief he describes the area as a "God-forsaken industrial wasteland." The area would have satisfied the criteria of the city's ordinance except that the property was within 400 feet of a sliver-thin wedge-shaped *vacant lot* immediately adjacent to the freeway on which it was then theoretically possible—well, *maybe* theoretically possible, the trial court never got that far—to build a single residence.[2] From the thin edge of the wedge of the parcel to Gammoh's property was 150 feet, though it was also possible (again, the trial court never got so far as to make any findings on the point) that any residence that might have been constructed on the parcel still would have been more than 400 feet away, as the thick side of the wedge—the portion of the parcel where one would logically build a residence—was farther away from the Gammoh property than the thin side.

Gammoh submitted an application for his adult cabaret and while his application was pending the city amended its adult entertainment ordinance to add two new obstacles to his application. One, it just outright designated the industrial area where Gammoh's property was (south of La Palma, east of Gilbert) as off limits to adult businesses under the theory that the area was

---

requires that Gammoh construct a tacky "joint" instead of a tasteful "theatre"? "Burlesque house" might do as a term, but it would also seem somewhat inaccurate, at least if there are no baggy-pants comedians interspersed between dancers. We are left with "adult cabaret," which may be becoming a term of art anyway. (E.g., *Dease* v. *City of Anaheim, supra*, 826 F.Supp. at p. 339, fn. 5.) The point is legally important because, as we explain below, when the United States Supreme Court introduced the idea of "secondary effects" of so-called "adult" businesses into the substantive law of zoning, it necessarily forced courts to be conscious of what those effects exactly are, and that in turn requires reasonable precision in the language used.

[2]Because the parcel had been part of a section of town that had once been annexed to the city, the zoning for the parcel was a catch-all designation known as "RS-A 43000."

to be redeveloped for "upscale" industry. (The irony is not lost on us: The area was considered too "downscale" for an adult business!) Second, the city forbade adult businesses within 100 feet of a freeway on the theory that it would be bad for the city's public image.

Gammoh brought this lawsuit for both injunctive relief and damages for violation of his civil rights. He quickly sought a preliminary injunction. While declarations were submitted, no evidence was taken at the hearing and no factual findings were made. Essentially it was nothing more than one long oral argument, most of which was devoted to the question of whether a residence *might* be possible on the wedge-shaped sliver of property. The judge to whom the case was assigned at the time, Donald Smallwood, took the matter under submission and then filed a minute order denying the requested injunction, stating only that Anaheim's amended ordinance governed, i.e., the one that precluded adult businesses where Gammoh had leased his property and within 100 feet of a freeway.

About a year later the case came up for trial. One thing had changed in the interim: Any doubt as to whether the wedge-shaped sliver could ever be developed for residential use had now been eliminated. The area had been rezoned commercial.[3]

The judge to whom the case had been assigned after Judge Smallwood's retirement, Tully Seymour, entered a judgment in the city's favor on the ground that Judge Smallwood's denial of the preliminary injunction necessarily required Judge Smallwood to adjudicate the constitutionality of Anaheim's ordinance. Judge Seymour reasoned that, having denied the preliminary injunction, Judge Smallwood must necessarily have concluded that the ordinance was constitutional; Gammoh was thus collaterally estopped from relitigating what had already been litigated. From that judgment Gammoh has taken this appeal.

We reverse, though we need not engage in the academic exercise of determining whether Judge Seymour's decision on the collateral estoppel issue was correct, except to say that to the degree the judgment incorporated Judge Smallwood's decision it was based on error. None of the three obstacles found in Anaheim's amended ordinance pass constitutional muster.

---

[3]Gammoh contends that the city knew about the rezoning all along, because it had been planned by the Anaheim Redevelopment Agency since *before* his application. The city claims it is innocent, because *its* planning staff was not aware of the zoning change planned by the redevelopment agency's own in-house planning staff until after Gammoh's application had been denied. Obviously the question of what the city knew and when it knew it requires findings by a trier of fact, and so we cannot speculate at this juncture. The matter can be explored on remand in the context of Gammoh's civil rights claim.

■ In the first place, while reasonable location limits to keep adult businesses apart from residential zones are obviously constitutional, that principle cannot be twisted into a per se rule that anytime an adult business might be located within a given distance of any land zoned residential the location limit is always constitutional as applied. The thrust of the constitutional doctrine is that a city has a perfectly legitimate interest in preventing the "secondary effects" caused by the business, but that means there have *to be* some secondary effects. (See *Renton* v. *Playtime Theaters, Inc.* (1986) 475 U.S. 41, 50 [106 S.Ct. 925, 930, 89 L.Ed.2d 29]; *Smith* v. *County of Los Angeles* (1994) 24 Cal.App.4th 990, 1005 [29 Cal.Rptr.2d 680] ["To be constitutional these impacts must be 'secondary' effects of the adult business, e.g., traffic, crime, etc., not objections to the content of the expressive activity taking place at the adult business."].) A single adult business poses no secondary effects on an odd, practically undevelopable parcel of vacant land in an industrial zone.

■ The second reason for denying Gammoh a permit under the amended ordinance, the post hoc refusal to allow adult businesses in a section that one would think was otherwise perfect for them, fails for the same reason the ordinance failed in *Dease*, except the discretionary operation of the ordinance is more subtle. Under the facts of this case, the city's retroactive preclusionary zoning of the area in which Gammoh's property was located—*after* he first filed an application—functioned as a discretionary refusal to give him a permit. By changing the rules of the game while it was being played, the effect was to confer on the city the arbitrary power to censor speech.[4]

■ The third obstacle is plainly unconstitutional on its face. A city has no legitimate interest in protecting its "image" *qua* image as against the free speech rights of its citizens.[5] We quickly emphasize we are not addressing aesthetics. We are talking about whether the mere fact that a business is an

---

[4]Our holding on the point is a relatively narrow one, specific to the facts of this case. We do not opine that a city could *never* zone part of an industrial section in such a way as to keep out adult businesses—we need not address that issue given the nature of the present case. We do say that a city cannot take a section of industrial property otherwise amenable for adult businesses and, *after* someone makes an application to put an adult business there, preclude adult businesses in the zone on the theory that the area must now be redeveloped because more "upscale" development is desired. As we explain in more detail below, that amounts to a discretionary preclusion, because the city retains a power to deny a permit to which the operator would otherwise be entitled. Put another way, cities cannot, consistent with the First Amendment, use redevelopment zones as a creative way to censor speech about sex.

[5]Cities have different general reputations and images, of course. Some have broad shoulders (Chicago); some liken themselves to large fruit (Buenos Aires, New York); some are known for their fountains and hills (Rome); some for their heavy industry (Detroit, also known as "Motown"); some, when you tire of, you virtually tire of life (Samuel Johnson on London). One wag once described Las Vegas after the opening of a series of hotels with child care facilities as "sin city with baby strollers." Even so, a city's image is more a matter for the

adult one can be used as a reason to preclude its location near a freeway. Signs and outward appearances can, of course, be regulated. But "visual blight" can easily be prevented by lesser intrusive means than the complete preclusion of an adult business from any major roadway. This case is not about how Gammoh chooses to *advertise* his business. No issue of compliance with a city sign ordinance is before us, and the record indicates that Gammoh is *not* proposing to construct a huge billboard with pictures of scantily clad women in tacky pink flashing neon, "Come to Gammoh's Flesh Emporium." The application was about whether he could operate his business behind *closed doors*.

Given the circumstances of the case, the city's refusal to approve Gammoh's application contravened the First Amendment. We therefore direct the trial court to issue a writ of mandate ordering the city of Anaheim to approve the application. The balance of Gammoh's case is a civil rights cause of action, which must be returned for trial.

### Relevant Chronology

*Dease* v. *City of Anaheim, supra,* 826 F.Supp. 336, was filed in July 1993, striking down Anaheim's adult business ordinance as unconstitutional because it gave city officials "an unconstitutional level of substantive discretion" in granting permits for adult businesses. (See *id.* at p. 343.) Essentially, the ordinance provided that the city planning commission *could* grant a permit if certain conditions and standards were satisfied, but it wasn't required to. (*Id.* at p. 339 [quoting from the ordinance: " 'The Planning Commission, as an administrative act, *may* grant conditional use permits for any use hereinafter provided for, if the conditions and standards set forth herein are satisfied.' " (*Dease* court's italics)].) A little less than four months later, in October 1993, the city council passed Ordinance No. 5399, which regulated adult businesses. As mentioned above, this ordinance required that the business not be "located within four hundred (400) feet of any residential zone or residential use." As written, and as the city's own attorney emphasizes in his brief in this appeal, the ordinance was a mandatory one which gave the city no discretion: If its requirements were met, an application had to be approved; if not met, the application had to be denied.

A year after the *Dease* decision, in July 1994, Gammoh leased a building in an industrial section of Anaheim off the Riverside Freeway. The property is located very near the north side of the Riverside Freeway and was zoned "limited industrial." The next month, on August 8, 1994, Gammoh submitted an application to the city to operate a "sex-oriented business," featuring "exotic strip tease dancers"; he also wanted to have billiard tables. The application envisioned 224 seats.

---

poets and journalists than the courts; as we explain anon, municipal image *qua* image cannot help but run into the First Amendment.

Within less than 10 days the city adopted an emergency ordinance which imposed a 45-day moratorium on issuing any adult business permits in any limited industrial zone. On August 31, a city license official wrote to Gammoh to inform him of the emergency moratorium, stating that the city would hold his application until a final decision was made as to "location issues." The letter also stated, without much elaboration, that the application had "triggered a number of issues, including, without limitation, . . . additional information needed to determine conformance with the provisions of 18.89 [the chapter in the city's municipal code governing sex-oriented businesses]".) And even though the letter said the city would "hold" Gammoh's application, it also stated (in an apparent allusion to the wedge-shaped sliver of property to which we have already referred) that his proposed site did not "meet the location requirements" in the city's adult-business ordinance "which were in place prior to the date" the application was received.

During the moratorium, on September 22, 1994, Gammoh filed this action for a writ of mandate and for damages for violation of civil rights. Five days later, also during the moratorium, the city passed an amended ordinance, No. 5452, which added a prohibition on sex-oriented businesses within the area where Gammoh had leased his property. The ordinance further prohibited any adult business from operating within 100 feet of a freeway. The new ordinance, however, was prospective only.

On October 10, 1994, the city formally denied Gammoh's application, giving two reasons: (1) The proposed location was within 400 feet of "a residential zone," i.e. the wedge-shaped vacant lot zoned RS-A 43000; and (2) the proposed location did not meet the parking requirement, because it appeared he would need about 123 parking spaces for the kind of theater involved (224 seats) and would also be offering the use of billiard tables, but the building at the location provided only 20 parking spaces. To cure the parking problem, Gammoh submitted what he claimed was an amended application, but which the city chose to treat as a *new* application, on October 24, 1994. The application (regardless of whether it was new or amended) proposed a scaled down operation (he went from 224 seats to 88 seats) and no billiards. In a letter written four days after Gammoh's "submission" (to use a neutral word), the city stated that it would treat it as a new application, and treat it under the new ordinance, No. 5452.

That application was still pending when, in early December 1994, Gammoh asked for a preliminary injunction in this case. The matter was heard on December 23 in a long oral argument before Judge Smallwood, to whom the case had been originally assigned. Judge Smallwood took the matter under submission on December 23. Six days later, while the matter was still under

submission, the city's zoning administrator formally denied what the city considered Gammoh's second application for these reasons:

—it was 150 feet away from "residentially zoned" property;

—it was located in an area (south of La Palma Street and east of Gilbert Street) that the city had just recently declared could not have any sex-oriented businesses; and

—it was within 100 feet of a freeway.

Parking was *not* one of the three reasons mentioned for the denial of the permit in the December 29, 1994, decision. That obstacle, at least, had been overcome.

The next day, December 30, while the matter was still under submission, the case was "reassigned" to Judge Seymour. On January 12, 1995, Judge Smallwood made his decision. He denied the requested preliminary injunction in a cryptic minute order, which basically said that the submission for a scaled down theater was a "new application" and "there was no violation of any mandatory duty on the part of the respondent."[6] When the case was called for trial, Judge Seymour concluded that Judge Smallwood had necessarily found the amended ordinance to be constitutional in his ruling denying the preliminary injunction; therefore, nothing was left to decide. From the defense judgment Gammoh has filed this appeal.

*This Court Must Address the Merits*

As a preliminary matter we need note that it is not necessary to determine whether Judge Seymour erred in giving collateral estoppel effect to Judge Smallwood's ruling on the request for a preliminary injunction. All we need consider is whether *this* court should consider the merits of Gammoh's appeal, or whether the case has already been disposed of by some application of either collateral estoppel or res judicata. And the answer to that, of course, is no.

The city argues that in denying Gammoh's writ petition after he lost the battle for a preliminary injunction we necessarily rejected what it terms as

---

[6]Here is the complete text of the court's minute order:

"No appearance. The Motion for Order Issuing Peremptory Writ of Mandamus and/or in the Alternative for Preliminary Injunction having been submitted on December 23, 1994, the Court now makes its ruling. The plaintiff's application filed on 10-21-94 and supplemental on 11-2-94 was a new application. There was no violation of any mandatory duty on the part of the respondent. The Petition for Writ of Mandamus is denied. In the alternative the request for Preliminary Injunction is denied. Respondent, City of Anaheim is directed to prepare a formal order."

Gammoh's "alternative site" argument on the merits.[7] While the city doesn't quite articulate what it means by Gammoh's supposed "alternative site" argument, we may assume that it wants us to construe it broadly, i.e., that Gammoh is saying that the city's ordinance didn't provide any "alternative sites" for Gammoh to run an adult business and therefore was unconstitutional. The subtext to the *city's* argument, which it never quite dares to voice, is that the city could do what it pleased with Gammoh's application to run an adult business on his property as long as there were other areas in the city where one could (in theory at least) run an adult business. The idea seems to be that as long as there are "alternative sites" there can be no First Amendment right to operate an adult business on any given piece of land, no matter how otherwise suitable that land might be.

We will address the substance of the city's argument below. For now it is enough to say that in summarily denying the writ petition this court most certainly did not preclude Gammoh from raising the argument that the city unconstitutionally denied his permit application. We have never passed on the merits of Gammoh's arguments; and Gammoh has a right to an appeal from the final judgment in this case and receive a written statement of reasons for the court's decision.

The city cites *Molar* v. *Gates* (1979) 98 Cal.App.3d 1 [159 Cal.Rptr. 239, 12 A.L.R.4th 1197] and *Mulrooney* v. *Employers Reinsurance Corp.* (1969) 1 Cal.App.3d 942 [81 Cal.Rptr. 907] for the proposition that in denying the writ petition, we necessarily rejected Gammoh's "alternative site" argument (whatever precisely this "alternative site" argument is) and therefore he is collaterally estopped from litigating it now. *Molar* merely observed that mandamus is an "appropriate remedy" to enforce a constitutional right (*Molar, supra*, 98 Cal.App.3d at p. 25) while *Mulrooney* simply said that some things, like whether someone had a good faith belief in the truth of a certain statement, could indeed be deduced by "necessary implication" from a previous slander action. (See *Mulrooney, supra*, 1 Cal.App.3d at pp. 945-946.)

The city's argument misconstrues the significance of denials of writ petitions and ascribes to them (and, by implication, the appellate court) a

---

[7]To quote from page 37 of the city's respondent's brief: "In Denying Appellant's Request for Issuance of the Writ, this Court Necessarily Decided and Rejected Appellant's Alternative Sites Argument. [¶] Appellant's alternative sites argument was necessarily decided by this Court when it denied Appellant's request to issue the writ." Actually, what we denied was a request by Gammoh to treat a previously filed appeal *as* a writ petition instead of dismissing the appeal. For purposes of our discussion here, we will assume that the denial of Gammoh's request was the functional equivalent of denying a petition for writ of mandate. (See *U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 12 [112 Cal.Rptr. 18] [treating defective appeal as writ held appropriate where facts showed "propriety of a petition for writ of mandate in the first instance"].)

legal omniscience at odds with basic writ procedure. To say that this court has already decided that the Anaheim statute is constitutional by summarily denying Gammoh's writ petition is rather like saying, in an era (circa, say, 1593) when it was considered lewd for women to appear in any kind of theatrical performance, that a particular actress who appeared on a stage could not possibly be a woman because the Queen of England was in attendance and, by definition, the Queen of England does not attend lewd performances. The conclusion simply does not follow from the facts.

█ Just because a Court of Appeal denies a petition for writ of mandate does not mean it has made a decision on the merits having res judicata effect. The proper rule, as expressed by the Supreme Court, is that unless there is a written opinion following the issuance of an alternative writ, the denial of a writ petition does not have issue preclusive effect. (See *Kowis* v. *Howard* (1992) 3 Cal.4th 888, 891 [12 Cal.Rptr.2d 728, 838 P.2d 250]; see also *Matuz* v. *Gerardin Corp.* (1989) 207 Cal.App.3d 203, 205, fn. 2 [254 Cal.Rptr. 725] ["The summary denial, without opinion, of defendants' petition for writ of mandate was not a ruling on the merits of the demurrer and hence was not res judicata of the merits of a subsequent proceeding."].) We therefore proceed to the merits.

*The Three Grounds Given to Deny Gammoh's Second Petition Are All Constitutionally Invalid*

*The Residential Zone Limit*

In *Renton* v. *Playtime Theaters, Inc., supra,* 475 U.S. 41, the United States Supreme Court held that an ordinance requiring that an adult motion picture theater could not be located within 1,000 feet of any "residential zone" was constitutional as a "time, place and manner" of speech regulation because the ordinance was reasonably related to protecting the city against the "undesirable secondary effects of such businesses." (*Id.* at pp. 46-49 [106 S.Ct. at pp. 928-930].) The point was that the city's interest in protecting "the quality of urban life" enabled the ordinance to be upheld as against a free speech challenge (see *id.* at p. 50 [106 S.Ct. at p. 930]). While the high court never specified exactly what the "secondary effects" of adult motion picture theaters are,[8] it is clear from the opinion that it was those secondary effects which justified the ordinance as a reasonable time, place and manner restriction on speech and not an infringement of the First Amendment.

---

[8]The court did note the federal district court found the ordinance was designed to "protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' " (see 475 U.S. at p. 48 [106 S.Ct. at p. 929]). It also cited a Washington State Supreme Court decision mentioning the finding that " 'the location of adult theaters has a harmful effect on the area and contribute to neighborhood blight.' " (*Id.* at p. 51 [106 S.Ct. at p. 931], citing *Northend Cinema, Inc.* v. *City of Seattle* (1978) 90 Wn.2d 709 [585 P.2d 1153, 1156, 1 A.L.R.4th 1284].) It appears that the spectres of New York's Times Square and Boston's

■ The salient fact in the present case, of course, is that no "secondary effects" on real human beings living in a real residential area were ever realistically possible when Gammoh first applied for his permit, and any doubt was later removed when the property was rezoned. Essentially, the city's position has been, and remains, that even so much as one vacant lot in an industrial area which theoretically might have a residential structure built on it may be used to preclude an adult business.

The city's position strays beyond the bounds of reason. None of the interests which typically justify regulations of adult businesses (decreased property values, prevention of crime, prevention of blight) could have been in *any* way implicated by a single wedge-shaped vacant lot next to a freeway on which no one in his or her right mind would ever construct a residence. In such a situation, the use of the " 'power to zone as a pretext for suppressing expression' " is practically telegraphed to a neutral observer. (See *Renton* v. *Playtime Theaters, Inc., supra*, 475 U.S. at p. 54 [106 S.Ct. at p. 932].) If adult businesses pose any sorts of risk, they do not pose them to isolated vacant lots in industrial areas.

Nor can the city rely on *Renton* on this regard, because in that case there was no argument that the land which was zoned residential was not in fact used, or realistically going to be used, by actual residents for residences. While the *Renton* decision indicates that a lot line requirement may be constitutional on its *face*, it would be inconsistent with *Renton*'s "secondary effects" rationale to say that a lot line ordinance cannot be unconstitutional *as applied*.[9] Here, there was never any realistic possibility that Gammoh's business threatened the quality of life of any nearby resident, so the city's

---

"Combat Zone"—which acquired a nationwide reputation for being raunchy and dangerous places in the mid-1980's—loomed heavy over the decision, even if unmentioned.

[9]The city strenuously argues that to say a facially constitutional adult business zoning ordinance may be unconstitutional as applied is to introduce a fatal element of discretion into the analysis, in contravention of *Dease, supra,* 826 F.Supp. 336 and *Smith, supra,* 24 Cal.App.4th 990, 1000 (finding *Dease* "persuasive" and holding that county ordinance was unconstitutional because its vagueness as to buffering gave officials too much discretion). The argument is an attempt to use *Dease* and *Smith* as swords to infringe free speech rather than, as they were written, as shields protecting free speech. It is a non sequitur to say that because an ordinance cannot give officials discretion to subject the exercise of free speech to the prior restraint of a license without narrow, objective and definite standards—as *Dease* and *Smith* certainly hold—that an ordinance which *does* subject free speech to prior restraint because it sets forth narrow, objective and definite standards can *never* be unconstitutional as applied to a given situation. Indeed, *Smith* adumbrated our analysis when it pointed out that one of the deficiencies in the county ordinance there at issue was too vague because it referred to any zone in which residences were "permitted" no matter "how it is or will be used." (See *Smith, supra,* 24 Cal.App.4th at p. 1006.) It does *not* vest city officials with unconstitutional discretion to censor free speech merely to say that there may be times when a variance to an otherwise facially constitutional adult zoning ordinance must be granted.

Of course, our opinion on the "as applied issue" should not be read more broadly than the narrow facts of this particular case: a single, vacant, irregularly shaped lot in an industrial

ordinance was unconstitutional *as applied* in the context of both of his applications.

### The Preference for "Upscale" Industry

After Gammoh filed his first application, the city was—to use the phrase from its letter explaining its position on the moratorium—"triggered" into action. ▮▮▮ The industrial area in which Gammoh's property was located was suddenly off limits to adult businesses. The city attempts to justify this ground of denial on the theory that adult businesses would retard its plans to replace older industry in Gammoh's area with new, "upscale" industry—cleaner and higher tech than what is currently there.

Under the peculiar circumstances of this case, we need not go so far as to say that a city could never preclude adult businesses from an industrial section which was otherwise perfect for them on the basis that they would retard the "redevelopment" of that zone. That question can be left for another day. We need only recognize, however, that in this case the city's *after-the-fact* preclusion of adult businesses from the area in the wake of a permit application that was otherwise destined to be approved (Gammoh's first application was turned down on the basis of one unconstitutional lot line requirement and a parking problem that he had within his own power to remedy) functioned as nothing less than a *discretionary* denial of his permit application.

It must be remembered that the original sin of Anaheim's adult business ordinance, as *Dease* explained, was the discretionary power it gave city officials. In the wake of *Dease*, the city changed its ordinance to eliminate discretion. Relying on the city's new ordinance, Gammoh leased property and made his application. There was no inherent "secondary effects" barrier to Gammoh's application: The city could not claim harmful effects on a vacant lot so as to deny the application, and it was within Gammoh's power to scale back his proposed operation to stay within parking requirements. So what did the city do? Essentially it rezoned Gammoh's property to preclude any kind of adult businesses on the ground that they would hinder "redevelopment." If a city can do that, then a city has the *de facto discretionary* power to deny an otherwise *non*discretionary permit by the simple expedient of saying that an adult business would be inconsistent with some hoped-for "upscale" development.

---

area which only the most eccentric person would use to build a custom home. The case of a tract of land likely to be developed into a residential neighborhood is not before us. We also express no opinion on any civil rights liability which might, or might not, pertain to a city's decision to grant a variance. Suffice to say that city councils grant variances to zoning ordinances on a relatively regular basis.

In context and as applied in this case, "redevelopment" thus becomes a tool for a city to arbitrarily exclude adult businesses. A city need only, as indeed happened in the case before us, first confine any proposed adult business to an industrial area and then, faced with the possibility that one might actually locate there, simply announce that it wants to redevelop the area surrounding the proposed site. In effect, redevelopment law becomes censorship by other means. The only way to avoid the de facto discretion inherent in such a scheme is to hold that the city cannot use redevelopment as a rationale to *retroactively* exclude adult businesses from areas which are otherwise suitable for them. Otherwise, cities could engage in shell games to make it virtually impossible for an adult business to operate. (See *City of Stanton* v. *Cox* (1989) 207 Cal.App.3d 1557, 1566 [255 Cal.Rptr. 682] [500 feet residential lot line requirement, requirement that adult businesses be no less than 1,000 feet from each other, and city's relatively small geographic area had the combined effect of unconstitutionally precluding adult businesses]; *Santa Fe Springs Realty* v. *City of Westminster* (C.D.Cal. 1995) 906 F.Supp. 1341, 1355 ["No city, however, may totally ban such businesses or make it practically impossible to operate such a business within the city limits."].)

As applied to Gammoh's application under the particular facts of this case, the city's ordinance excluding adult businesses from the area south of La Palma and east of Gilbert was unconstitutional.

### The Freeway Exclusion

The freeway exclusion is unconstitutional on its face. The city has advanced two rationales for the requirement.

The first rationale, advanced in the declaration by the city zoning official in opposition to the request for a preliminary injunction, is that the requirement was needed to protect Anaheim's family "image."[10] The city has backed off the image theory in its brief. And with good reason. Image—as distinct from actual aesthetics as it is often litigated in land use law—is a matter of core speech, involving all sorts of artistic and philosophical ideas.

The reason now stressed is the avoidance of visual blight. But this legitimate governmental interest runs into the "less intrusive means" problem. Visual blight, like the secondary effects on nearby residents, is a matter which is susceptible to fixing by less intrusive means than an outright ban.

---

[10]In oral argument, Judge Smallwood was rather amused by this rationale, pointing out that the city's "image" included a particular thoroughfare that in Orange County is practically a byword for prostitution.

(See *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 798 [109 S.Ct. 2746, 2757, 105 L.Ed.2d 661] [". . . a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests"].)[11] There is no necessary relation between the mere existence of an adult business and *visual* blight. That is what sign ordinances are all about. Indeed, to the degree that a city adopts a strategy of "dispersing" adult businesses, any tendency toward "visual blight" will be ameliorated. Since Anaheim has adopted a dispersal strategy, the possibility of "visual blight" is nonexistent given appropriate sign and exterior requirements. The isolated industrial area where Gammoh leased his property is in no danger of becoming Times Square.

### Disposition

The judgment in the city's favor is reversed. The court is directed to issue a writ of mandate to approve Gammoh's second application (the one for the scaled back theater), and the case is otherwise remanded for trial on Gammoh's civil rights cause of action. Gammoh will recover his costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied July 29, 1999, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied September 29, 1999.

---

[11]We need not ascertain the United States Supreme Court's current thinking as to whether the means must be "the least restrictive." (See 491 U.S. at p. 798 [109 S. Ct. at p. 2757].) It is enough to note for now that the First Amendment requires "narrower" as distinct from "broader" tailoring of adult zoning ordinances.