SANTA FE SPRINGS REALTY CORP., a California corporation, Plaintiff,

v.

CITY OF WESTMINSTER, a Municipal corporation, Defendant.

No. CV 94–736 LEW.

United States District Court, C.D. California.

Oct. 20, 1995.

Richard Jones, City Attorney, City of Westminster; and Deborah J. Fox and Dawn R. Andrews of Freilich, Kaufman, Fox & Sohagi, Los Angeles, CA, for Defendant City of Westminster.

Roger Jon Diamond, Santa Monica, CA, for Plaintiff Santa Fe Springs Realty Corp.

## MEMORANDUM OF DECISION
## AND ORDER

LAUGHLIN E. WATERS, Senior District Judge.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

## 1. FACTUAL BACKGROUND

The plaintiff in this case, Santa Fe Springs Realty Corporation, is currently operating an adult cabaret ("Scamps") at 7000 Garden Grove Boulevard in the City of Westminster ("the City"). The plaintiff filed the present action after the City refused to issue a conditional use permit ("CUP") for the plaintiff's adult cabaret.

The complaint alleges that the presentation of topless dancing is a form of expression protected by the First Amendment of the United States Constitution and that the City of Westminster impinged upon the plaintiff's First Amendment rights when it denied the CUP application.

The City of Westminster regulates adult businesses through Chapter 17.57 of the Westminster Municipal Code. The City's current adult use ordinances, which have been amended several times, were enacted after another individual (Theron Smith) sought to open an adult cabaret at 7132 Garden Grove Boulevard in the City of Westminster.

At the time when Smith attempted to open his adult cabaret, an urgency ordinance was in effect which banned all adult businesses within the City limits. *See* Ordinances No. 2143, 2145. The moratorium applied to massage parlors, adult bookstores, adult theatres including topless bars, adult arcades, adult specialty shops, acupressure, escort services, public baths, card rooms, billiard rooms, pool halls, figure modeling studios, adult dance studios, dance studios operating after 10:00 p.m., rap session and interlocutrix businesses, gambling schools, skin care businesses, tanning salons, and any and all other adult uses as defined by the Westminster police department. *Id.* After Smith began operating his adult cabaret, the police department inspected the premises and found the establishment to be in violation of the two urgency ordinances.

On January 24, 1991, Smith filed a complaint in Orange County Superior Court challenging the constitutionality of the urgency ordinances. In response to the complaint by Smith, the City of Westminster enacted Ordinance No. 2152 on February 12, 1991, which

purported to allow some adult businesses to operate within the city limits. Although Ordinance No. 2152 did not allow an adult cabaret to operate at the property occupied by Smith, the City represented to Judge James R. Gray in the Orange County Superior Court that other properties within the city limits would meet the requirements of Ordinance No. 2152. In particular, the City represented that the property at 7000 Garden Grove Boulevard (the subject location of the present case) was a suitable site for an adult cabaret.

In order to test the application of the new ordinance, Judge Gray instructed Smith to file a CUP application to operate an adult cabaret at 7000 Garden Grove Boulevard. After the application was filed by Smith, the City Council made the following findings contained in Resolution No. 2944:

1. The proposed use is consistent with the General Plan of the City, any other adopted plan of the city, or the adopted plan of any other governmental agency in that the subject property is designated as "Commercial" by the Land Use Element of the City's General Plan, and that conditions nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and each of them, attached to this approval, serve to or will bring the proposed use into consistency with the Land Use, Noise, Circulation, and other elements of the General Plan;

2. That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping, and other development features prescribed in the Municipal Code or as otherwise required in order to integrate said use with the uses in the surrounding area in that condition nos. 1, 2(a), 2(b), 2(c), 2(d), 3, 4, 5, 7, 8, 9, and 10, and each of them, attached to this approval, serve to integrate the use with the surrounding area.

3. The proposed site is adequately served by highways or streets of sufficient width and improvement in that the proposed use is the conversion of an existing facility and does not propose to add any additional seating capacity;

4. That the proposed site is adequately served by other public and private service facilities as are required in that the proposed use is the conversion of an existing facility and does not propose to add any additional seating capacity;

5. The requested use at the proposed location will not adversely affect the use of a church, temple, or other place used exclusively for religious worship, school, park, playground, mobile home park, or similar use within a 250 foot radius in that the applicant has submitted a site plan which shows sufficient buffering between the proposed use and these enumerated uses;

6. The requested use at the proposed location will not be located within a 250 foot radius of any residential zone in that the applicant has submitted a site plan which shows that the subject property is not within 250 feet of any residential zone;

7. The requested use at the proposed location will not be located within a 200 foot radius of any other regulated use under this Ordinance in that the applicant has submitted a site plan which shows that the subject property is not within 200 feet of any other regulated use;

8. The requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect such areas in that the applicant has submitted a site plan which shows sufficient buffering between the proposed use and residential areas within the immediate vicinity; and

9. The exterior appearance of the structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight or deterioration or substantially diminish or impair property values within the neighborhood, in that condition nos. 1, 2(a), 2(b), 2(c), 2(d), 3, 4, 5, 7, 8, 9, and 10, and each of them, attached to this approval, serve to improve and maintain the exterior appearance of the structure.

After the Smith application was approved by the City Council, the Orange County action was dismissed. Although the CUP application was approved for the property, Smith never opened or operated an adult cabaret at the site. At the time when Smith's application was approved, the City Council was aware that the owner of the property would refuse to lease the premises at 7000 Garden Grove Boulevard to Smith or any other person who planned to operate an adult cabaret.

**THE PRESENT CASE:**

At the time when Smith filed his CUP application, the property at 7000 Garden Grove Boulevard was used to operate a nightclub ("the Marquee") which featured rock and roll bands. The Marquee was operated by an individual named Bob Martin, who is also the current operator of Scamps. After Smith's CUP application was approved by the City Council, the plaintiff's attorney in this case introduced Mr. Martin to James Massoli and Michelle Inman. Following a series of negotiations, these individuals formed Santa Fe Springs Realty Corporation, the plaintiff in this case.

Santa Fe Springs Realty Corporation applied for a CUP to operate an adult cabaret at 7000 Garden Grove Boulevard, and the plaintiff's application was complete as of December 23, 1993. Chapter 17.57, the applicable provision of the Westminster Municipal Code that was in effect at that time provided that:

The planning commission or city council shall approve or conditionally approve an application for a conditional use permit where the information submitted by the applicant substantiates the following findings:

1. That the proposed use will be consistent with the Westminster General Plan, any other applicable adopted plan of the city, or any applicable adopted plan of any other governmental agency;

2. That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping, and other development features prescribed in the Municipal Code or as otherwise required in order to integrate said use with the uses in the surrounding area;

3. That the proposed site is adequately served by highways or streets of sufficient width and improved as necessary to carry the kind or quantity of traffic that such use would generate;

4. That the proposed site is adequately served by other public and private service facilities as are required;

5. That the requested use at the proposed location will not adversely affect the use of a church, temple, or other place used exclusively for religious worship; school, park, playground, mobile home park, or similar use within a 250 foot radius;

6. That the requested use at the proposed location will not be located within a 250 foot radius of any residential zone. The distance between a proposed use and a residential zone shall be the nearest lot line included within the residential zone along a straight line extended between two points;

7. That the requested use at the proposed location will not be located within 250 feet of any other regulated use under this chapter. Distances between uses shall be measured between the main entrances of such uses or proposed uses along the shortest route intended and available for public traverse between said uses;

8. That the requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect such areas;

9. That the exterior appearance of the structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight or deterioration or substantially diminish or impair property values within the neighborhood; and

10. That the signs posted at the business shall conform to the regulations estab-

lished in chapter 15.40 (sign code) and chapter 17.67 (Redevelopment Design Standards) of the Municipal Code.

Prior to the Planning Commission meeting on January 24, 1994, the City's Planning and Building Director, Michael Bouvier, conducted an investigation as required by Section 17.57.110(C) of the Westminster Municipal Code. After consulting with the building, police, fire and health departments, Mr. Bouvier prepared a detailed report recommending that the Planning Commission conditionally approve the CUP application.

The Planning and Building Director's Report contained the following findings:

1. The proposed use is allowed in the C2 district, subject to a conditional use permit under Chapter 17.57 of the Westminster Municipal Code.

2. The proposed use is consistent with the General Plan commercial use criteria.

3. The proposed adult cabaret is at least 250 feet away from the nearest residential zone boundary, and therefore meets the separation requirements set forth in the city's adult use regulations.

4. There are no other adult uses within 200 feet of the proposed adult cabaret.

5. The design of the interior, *as conditioned*, will satisfy the requirements of the adult use regulations and should serve to mitigate the adverse secondary effects that might result from the operation of an adult use establishment.

6. The security measures stipulated by this permit should mitigate the adverse secondary effects that might result from the operation of an adult use establishment.

7. The size and shape of the property provides adequate area to satisfy all commercial development requirements.

At the Planning Commission meeting on January 24, 1994, the commission heard testimony from the plaintiff's attorney. The commission also heard testimony from several citizens of the City of Westminster who expressed their strong opposition to the project. Despite the City Council's findings in the previous Smith application and despite the recommendation by the Planning and Building Director, the Planning Commission declined to grant or conditionally grant the plaintiff's application for a CUP. Instead, the Planning Commission, over plaintiff's objection, postponed their decision for one month in violation of Section 17.57.110 of the Westminster Municipal Code. Following the continuance by the Planning Commission, the plaintiff requested a *de novo* review by the City Council, as authorized by section 17.57.120 of the Westminster Municipal Code.

Prior to the City Council's hearing on February 22, 1994, the City's Planning and Building Director issued a new report recommending that the CUP be denied. The February 22, 1994 report contains the following findings, which differ significantly from those in the January 24 report:

1. The proposed use is allowed in the C2 district, subject to a conditional use permit under Chapter 17.57 of the Westminster Municipal Code.

2. The proposed adult business is of a type that has been well documented by qualified persons, and in case law, as creating secondary adverse effects on surrounding properties, such as criminal activity, blight and degradation of the commercial district. The existing business has generated a large number of calls for police services, involving noise disturbances, fights, assaults, robberies, drug dealing and public inebriation. The present management of the existing nightclub business will continue in that capacity for the proposed adult cabaret. In view of the extensive police activity at the location during the present management's tenure, which is of a greater amount than for any other similar establishment in the city, it is reasonable to expect that the management will be no more able to control the undesirable activities that generate calls for police service under the new business than it did under the old one. Accordingly, the finding required under Section 17.57.160(8) cannot be made.

3. The proposed use has a potential seating capacity for over 331 persons, while the available parking is only 76 spaces. The

Traffic Bureau of the Police Department has indicated that the present Marquee nightclub, which has fewer seats, experiences severe parking problems, typically on weekends, and that patron parking extends onto the adjacent commercial properties, across Garden Grove Boulevard on the shoulder, and into nearby residential areas. The street adjacent to the Marquee becomes very congested and traffic accidents are common.

4. The present business is licensed to serve beer and wine only, whereas the proposed business will serve beer, wine and spirits. In view of the documented large numbers of police calls for disturbances, assaults and fights involving inebriated patrons, the addition of spirits to the existing beer and wine service is an unacceptable intensification of the business.

5. The proposed new General Plan contains a policy which stipulates that commercial and industrial developments shall be required to clearly demonstrate that they will have no significant detrimental impacts upon the City and its residents, including significant adverse traffic, noise, air pollution and fiscal impacts. The proposed business will exacerbate an existing traffic and parking problem related to the existing use by virtue of the fact that the new business will be an intensification of the use, as it will be providing additional seating and adult entertainment. Therefore, the finding required under Section 17.57.160(1) cannot be made.

6. Based upon police experience with the existing business and the intensification of activity expected to occur with the proposed business, there is substantial evidence to indicate that there is inadequate on-site parking available to serve the proposed use, and as a consequence, the finding required by Section 17.57.160(2) as it relates to parking cannot be made.

7. The proposed design of the parking facilities for the requested business contains a landscaping deficiency of approximately 1700 square feet. Therefore, the finding required by Section 17.57.160(2) as it relates to landscaping cannot be made.

8. The condition of the property, which is characterized by severely deteriorated pavement, absence of landscaping, and poor building maintenance and appearance, results in blight and consequently impairs property values in the area. As the same management who has operated the business for the last several years and has allowed the property to deteriorate to its present condition will also operate the proposed business, it is reasonable to expect that these blighted conditions will not be significantly corrected in the future, or if corrected, will not be maintained. Therefore, the finding required by Section 17.57.160(9) cannot be made.

9. Traffic accident records for the years 1991 through 1993 for the portion of Garden Grove Boulevard between Edwards Street and Goldenwest Street (which contains the Marquee) shows that during the hours when the Marquee is typically open—9 p.m. to 2 a.m.—an abnormally high number of traffic accidents occur. As the only source of traffic is patrons of the Marquee, the majority of accidents can be attributed to them. Therefore, the finding required by Section 17.57.160(3) cannot be made.

At the conclusion of the February 22, 1994 hearing, the City Council denied the plaintiff's application for a conditional use permit. On March 8, 1994, the City Council issued Resolution No. 3148, which contained the following findings:

1. The proposed site is not adequate in size and shape to accommodate the landscaping requirements prescribed in the Municipal Code or as required in order to integrate the proposed use with the surrounding area. The applicant proposed to landscape an area which is located within the Flood Control District's twenty (20) foot wide easement located on the east side of the subject property. This is impermissible as the applicant has failed to provide any evidence that it has any legal authority to encroach onto the District's easement. Further, the City land-

scape requirements require a perimeter landscaping of five (5) feet while the offered plan is only three (3) feet wide. The applicant is therefore deficient by 1700 square feet to meet the City's landscaping requirements.

2. The proposed site is not adequate in size and shape to accommodate the parking requirements or as required in order to integrate the proposed use with the surrounding area. The site has experienced a history of severe parking problems resulting in patron parking overflowing onto adjacent commercial properties, onto the unpaved shoulder of Garden Grove Boulevard to the north and into the residential tract located to the west. Accidents have occurred as a result of patrons crossing Garden Grove Boulevard. The parking problems at the site are impacted further because of the poor condition and design of the parking facilities and the placement of the building on the site in such a manner to create a narrow passage on the east side of the building.

3. The proposed site is not adequately served by streets of sufficient width and improved as necessary to carry the kind and quality of traffic that such an adult use facility would generate. The traffic data for the period 1991 through 1993 for the portion of Garden Grove Boulevard between Edwards Street on the west and the 22 Freeway off-ramp on the east, which area includes the subject property, revealed an abnormally high number of auto accidents. This stretch of Garden Grove Boulevard primarily services the residential areas located west of Goldenwest and accordingly, there should be little home-bound traffic during the hours of 9:00 p.m. and 2:00 a.m. These hours are the typical business hours for the Marquee and accordingly, the majority of accidents can be attributed to this facility. The proposed use including an intensification of the existing use will only serve to continue and/or increase the noted traffic problems.

4. The proposed exterior appearance of the structure will not be consistent with the external appearances of commercial structures already constructed within the immediate neighborhood and will cause blight or deterioration of the property values within the neighborhood. The existing facility presently has severely deteriorated pavement, no landscaping, and poor building maintenance and appearance as illustrated by the photographs. It is reasonable to conclude with the same operator and an intensification of use that these problems will continue.

5. The existing pole sign located on the site which is proposed to be re-faced does not comply with the City's Design Guidelines as it exceeds the height limitation and pole signs are not permitted.

6. The proposed adult use facility is not consistent with the City's proposed General Plan policy which states that commercial and industrial developments shall be required to clearly demonstrate that they will have no significant detrimental impacts upon the City and its residents, including significant adverse traffic, noise, air pollution, and fiscal impacts. The proposed use will exacerbate an existing traffic and parking problem related to the present use by virtue of the fact that the new use will be an intensification, as it will be providing additional seating at the facility. Further, the applicant's representative, Bob Martin, is the present operator of the existing facility commonly known as the Marquee nightclub. The calls for police service evidenced at the Marquee are excessively high for an establishment of this nature and it is reasonable to conclude with the same operator and an intensification of use that these problems will only continue, if not worsen. Further, fiscal impacts to the City and the impacts of noise and parking are significantly adverse.

The current action was filed by the plaintiff on February 2, 1994. The original complaint challenged the manner in which the conditional use permit criteria were applied to the plaintiff in this case. The complaint was later amended to add a facial challenge to the City's adult use ordinances.

On March 22, 1994, this Court issued an Order denying the defendant's motion to dismiss or, in the alternative, for summary judgment. The Court also denied the defendant's motion to abstain from the exercise of jurisdiction. On April 4, 1994, the Court issued a preliminary injunction which allowed the plaintiff to open its adult cabaret without obtaining a CUP from the City.

**INTERIM PROCEEDINGS:**

Between April of 1994 and February of 1995, the plaintiff made substantial renovations to the property. Among other things, the plaintiff regraded and repaved the parking lot, installed new exterior lighting, landscaped the surrounding property, installed a new fire hydrant, remodeled substantial portions of the building including the stage area and the restrooms, upgraded the sprinkler system, and made other cosmetic changes to the facilities. The property has been significantly improved as a result of the plaintiff's renovations.

On January 10, 1995, the City enacted Ordinance No. 2233, which amended various portions of Chapter 17.57 of the Westminster Municipal Code. The permit approval criteria contained in Section 17.57.160 were amended as follows:

A. Section 17.57.160(2) is repealed and replaced with the following: That the proposed use complies with the development and design requirements of the zone or land use designation in which it is to be located.

B. Section 17.57.160(5) is repealed and replaced with the following: The requested use at the proposed location will not be located within a two hundred fifty (250) foot radius of a church, temple or other place used exclusively for religious worship, school, park, playground, mobile home park or similar use.

C. Sections 17.57.160(8) and (9) are deleted in their entirety.

D. A new section 17.57.160(8) is hereby added as follows: That neither the applicant, if an individual, or any of the offi-

cers or general partners, if a corporation or partnership, have been found guilty or pleaded *nolo contendere* within the past four (4) years of a misdemeanor or a felony classified by the State as a sex or sex-related offense.

On February 21, 1995, this Court granted the plaintiff's motion for leave to file a First Amended Complaint. The First Amended Complaint includes facial challenges to Chapter 17.57 of the Municipal Code as well as an *as applied* challenge to the manner in which the permit approval criteria was applied in this case. The First Amended Complaint also included claims for monetary damages, but the Court granted partial summary judgment in favor of the defendant which eliminated all monetary damages in the case.[1]

On July 24, 1995, the Court held a court trial to resolve the plaintiff's remaining claims, which are purely equitable in nature.

## II. ANALYSIS

### A. PRELIMINARY ISSUES

#### 1. Standing

▇▇▇ In federal court, a litigant must have a significant stake in the controversy to merit bringing suit. The Supreme Court has stated that the irreducible constitutional minimum of standing contains three elements: (1) the plaintiff must suffer from some "injury in fact;" (2) the injury must be caused by the act being complained of (i.e., a violation of the Constitution); and (3) there must be a significant possibility that the plaintiff's injury will be redressed by giving the litigant the relief it seeks. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975).

▇▇▇ This Court has previously concluded that the plaintiff has standing to sue in this case. The plaintiff is currently operating a topless bar in the City of Westminster at a site zoned for such use. The first prong of the three-part test is satisfied because the

---

1. Plaintiff represented, at various times and before different municipal representatives and the City Council, that it would not pursue any dam-

age claim against the City. Just as many esteemed scholars perhaps may argue, routine trials *in nubibus* encourage settlement quickly.

plaintiff would incur monetary losses and would be prohibited from engaging in protected First Amendment activity if its adult cabaret were closed. The second prong is satisfied because the injury to the plaintiff would be caused by the act being complained of (i.e., a violation of the First Amendment). Finally, the third prong is satisfied because this injury will be redressed by granting injunctive relief which would allow the cabaret to remain open.

### 2. Abstention

#### a. *Younger* Abstention

■ In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts may not enjoin pending state court criminal proceedings. The Court has since applied the *Younger* doctrine to state civil and administrative proceedings.

■ Under *Younger* and its progeny, abstention is appropriate in favor of a state proceeding if: (1) the state proceedings are ongoing; (2) the proceedings implicate important state interests; and (3) the state proceedings provide an adequate opportunity to raise federal questions. *Beltran v. California,* 871 F.2d 777, 781 (9th Cir.1988).

■ "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *World Famous Drinking Emporium v. City of Tempe,* 820 F.2d 1079, 1082 (9th Cir.1987). "Absent significant countervailing interests, the federal courts are obliged to exercise their jurisdiction." *Id.* The rationale of *Younger* is based upon principles of comity and federalism. *Younger,* 401 U.S. at 44, 91 S.Ct. at 750–51.

■ Abstention under *Younger* is inappropriate where the state court proceedings fail to provide an adequate remedy. *Younger,* 401 U.S. at 45, 91 S.Ct. at 751. In this case, the court has previously ruled that abstention was inappropriate because the available state court remedy was inadequate.

Through a writ of mandate as provided by Cal.Code Civ.Proc. §§ 1084 and 1094.5, the plaintiff could have applied for a hearing with a state court tribunal to determine whether the City's Planning Commission or the City Council abused its discretion in refusing to issue a conditional use permit. Although some mechanisms exist which may have provided the plaintiff with an expedited hearing through the writ of mandate, an expedited hearing was not guaranteed.

Because this case involved an alleged ongoing First Amendment violation, time played a critical factor. Therefore, the Court concluded that abstention under *Younger* was inappropriate because immediate relief in the form of a preliminary injunction and restraining order was required.

No principles of comity or federalism were offended by this Court's exercise of jurisdiction. No state court proceedings were undermined by this Court's exercise of jurisdiction because no adjudicatory proceedings had commenced in state court prior to filing the federal action. *Cf. World Famous Drinking Emporium,* 820 F.2d at 1081. In addition, the plaintiff's federal claims were not presented to the City Council for determination and would not have been adequately addressed if the plaintiff had pursued relief in the state courts through a writ of mandate.

#### b. *Pullman* Abstention

■ Under the *Pullman* doctrine, federal court abstention is required when state law is uncertain and a state court's clarification of state law might make a federal court's constitutional ruling unnecessary. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under such circumstances, the federal court should not resolve the federal constitutional question until the matter has been sent to state court for determination of the uncertain issue of state law.

■ The Ninth Circuit has set forth a three-pronged test for determining the applicability of *Pullman* abstention: (1) the complaint must touch a sensitive area of social policy into which the federal courts should not enter unless there is no alternative to adjudication; (2) a definitive ruling on the state issues by a state court could obviate the need for constitutional adjudication by the federal court; and (3) the proper resolution of the potentially determinative state law

issue is uncertain. *Kollsman v. City of Los Angeles,* 737 F.2d 830, 833 (9th Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

■■■ This Court has previously ruled that *Pullman* abstention is inappropriate in this case. The defendant attempted to characterize the case as a typical land-use matter which is primarily a matter of state concern. However, the plaintiff has demonstrated that First Amendment issues are at the core of the present controversy. In addition, the Court finds that there are no genuine issues in this case which implicate uncertain areas of state law. Finally, as explained above, this court would not offend any notions of comity or federalism by exercising jurisdiction because no state court adjudication has taken place.

### 3. Exhaustion of Administrative Remedies

■■■ Unless exhaustion of administrative remedies is specifically required by statute, application of the doctrine of exhaustion is within the sound discretion of the trial court. *Daly–Murphy v. Winston,* 837 F.2d 348, 354 (9th Cir.1987); *United Farm Workers v. Arizona Agric. Employment Relations Bd.,* 669 F.2d 1249, 1253 (9th Cir.1982). As a general rule, suits under § 1983 of the United States Code are exempted from the exhaustion requirement because the remedy afforded by the Civil Rights Act is supplementary to the state court remedy.[2] *Board of Regents v. Tomanio,* 446 U.S. 478, 491, 100 S.Ct. 1790, 1798–99, 64 L.Ed.2d 440 (1980); *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481–82, 5 L.Ed.2d 492 (1961). Furthermore, a court may excuse a plaintiff from exhausting its administrative remedies if the remedies are inadequate or futile. *Damico v. California,* 389 U.S. 416, 416–17, 88 S.Ct. 526, 526–27, 19 L.Ed.2d 647 (1967); *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 2120, 20 L.Ed.2d 1319 (1968). In this case, the Court exercised its discretion not to require exhaustion of administrative remedies.

### 4. *Res Judicata*

■■■ The plaintiff filed this federal suit on February 2, 1994. Approximately two months prior to the expiration of the state-law statute of limitations, this Court issued an order stating that the plaintiff was not required to exhaust its administrative remedies. *See* Order filed March 22, 1994. Because the Court ruled that exhaustion of administrative remedies was not required, the failure of the plaintiff to pursue a writ of mandate in state court cannot have *res judicata* effect on its current challenge to the denial of the CUP.

### B. *AS APPLIED* CHALLENGE TO THE DENIAL OF A CONDITIONAL USE PERMIT

■■■ 42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (West 1994). In order to state a cause of action under § 1983, a plaintiff must demonstrate that a person acting under color of state law subjected the plaintiff or caused the plaintiff to be subjected to the deprivation of a right secured by the Constitution or laws of the United States. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 828–29, 105 S.Ct. 2427, 2438–39, 85 L.Ed.2d 791 (J. Brennan, concurring), *reh'g denied,* 473 U.S. 925, 106 S.Ct. 16, 87 L.Ed.2d 695 (1985).

### 1. Municipal Liability Under § 1983

■■■ The City of Westminster qualifies as a "person" to whom § 1983 applies.

---

**2.** None of the exceptions to this general rule for § 1983 cases is applicable in this case. *Cf. Bignall v. North Idaho College,* 538 F.2d 243, 246

(9th Cir.1976); *Toney v. Reagan,* 467 F.2d 953, 956 (9th Cir.1972).

*Monell v. Dept. of Social Servs.,* 436 U.S. 658, 688–89, 98 S.Ct. 2018, 2034–35, 56 L.Ed.2d 611 (1978). Municipal liability, upon a proper showing, may attach when action is taken by the City Council. This point need not be addressed, however, since Santa Fe Springs waived all claims for damages of any kind during meetings with city officials, during the hearing before the City Council and again during the course of proceedings in trial.

### 2. First Amendment Protection Afforded to Topless Dancing

▮ The presentation of topless dancing is a form of expression protected by the First Amendment of the Constitution, as applied to the states through the Fourteenth Amendment. *Schad v. Mt. Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981). The type of expressive conduct conveyed through nude or semi-nude dancing, however, receives a lesser level of constitutional protection because it falls on the outer perimeters of the activities protected by the First Amendment. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991). Because the type of expression conveyed through nude or semi-nude dancing does not implicate core First Amendment concerns, the states can take greater measures to regulate such activities.

▮ Under the analysis set forth in *City of Renton v. Playtime Theatres,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986), a city has the right to regulate where adult businesses can be located because of the secondary effects associated with such businesses. Through their zoning and building laws, cities possess substantial powers to limit the zones in which adult businesses can be located and to minimize the adverse effects typically associated with such businesses. No city, however, may totally ban such businesses or make it practically impossible to operate such a business within the city limits. *Renton,* 475 U.S. at 54, 106 S.Ct. at 932; *Topanga Press v. City of Los Angeles,* 989 F.2d 1524, 1529–33 (9th Cir.1993),

*cert. denied,* —— U.S. ——, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994).

▮ An adult business' First Amendment rights are violated when a local government effectively denies the adult business a reasonable opportunity to open and operate their enterprise within the city in question. *Renton,* 475 U.S. at 54, 106 S.Ct. at 932; *Topanga Press,* 989 F.2d at 1529. If a city adopts a permitting system which purports to allow adult businesses to operate in certain locations, the city must have a legitimate reason if it denies a CUP to an applicant who seeks to open an adult cabaret in a location zoned for such use.

In the context of an *as applied* challenge to the denial of a CUP, a plaintiff suffers a deprivation of First Amendment rights when a city prohibits the plaintiff from opening a topless bar without a legitimate reason. *Southeastern Promotions v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

### 3. Application in This Case

The City of Westminster regulates adult uses through Chapter 17.57 of the Westminster Municipal Code. At the time when the plaintiff applied for its conditional use permit, Chapter 17.57 provided, in pertinent part:

> The planning commission or city council shall approve or conditionally approve an application for a conditional use permit where the information submitted by the applicant substantiates the following findings:

1. That the proposed use will be consistent with the Westminster General Plan, any other applicable adopted plan of the city, or any applicable adopted plan of any other governmental agency;

2. That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping, and other development features prescribed in the Municipal Code or as otherwise required in order to integrate said use with the uses in the surrounding area;

3. That the proposed site is adequately served by highways or streets of sufficient width and improved as necessary to carry the kind or quantity of traffic that such use would generate;

4. That the proposed site is adequately served by other public and private service facilities as are required;

5. That the requested use at the proposed location will not adversely affect the use of a church, temple, or other place used exclusively for religious worship; school, park, playground, mobile home park, or similar use within a 250 foot radius;

6. That the requested use at the proposed location will not be located within a 250 foot radius of any residential zone. The distance between a proposed use and a residential zone shall be the nearest lot line included within the residential zone along a straight line extended between two points;

7. That the requested use at the proposed location will not be located within 250 feet of any other regulated use under this chapter. Distances between uses shall be measured between the main entrances of such uses or proposed uses along the shortest route intended and available for public traverse between said uses;

8. That the requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect such areas;

9. That the exterior appearance of the structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight or deterioration or substantially diminish or impair property values within the neighborhood; and

10. That the signs posted at the business shall conform to the regulations established in chapter 15.40 (sign code) and chapter 17.67 (Redevelopment Design Standards) of the Municipal Code.

The plaintiff filed an application with the City's Planning and Building Director requesting a conditional use permit for an adult cabaret at 7000 Garden Grove Boulevard featuring topless dancers and table top dancing with alcoholic beverage service. The plaintiff's conditional use permit application was complete as of December 23, 1993, and a hearing was scheduled before the City's Planning Commission.

Prior to the Planning Commission meeting, the City's Planning and Building Director, Michael Bouvier, prepared a detailed report recommending that the Planning Commission conditionally approve the application. The Planning and Building Director's Report contained the following findings:

1. The proposed use is allowed in the C2 district, subject to a conditional use permit under Chapter 17.57 of the Westminster Municipal Code.

2. The proposed use is consistent with the General Plan commercial use criteria.

3. The proposed adult cabaret is at least 250 feet away from the nearest residential zone boundary, and therefore meets the separation requirements set forth in the city's adult use regulations.

4. There are no other adult uses within 200 feet of the proposed adult cabaret.

5. The design of the interior, *as conditioned,* will satisfy the requirements of the adult use regulations and should serve to mitigate the adverse secondary effects that might result from the operation of an adult use establishment.

6. The security measures stipulated by this permit should mitigate the adverse secondary effects that might result from the operation of an adult use establishment.

7. The size and shape of the property provides adequate area to satisfy all commercial development requirements.

Prior to issuing the report, the Planning and Building Director conducted an investigation as required by Section 17.57.110(C) of the Westminster Municipal Code. At trial, Mr. Bouvier testified that the investigation included consultation with the building, police, fire and health departments. After con-

ducting this investigation, Mr. Bouvier issued the findings set forth above which are consistent with the earlier findings by the City Council in relation to the Smith application for the property.

At the Planning Commission meeting on January 24, 1994, the commission heard testimony from the plaintiff's attorney. The commission also heard testimony from several citizens of the City of Westminster who expressed their strong opposition to the project. Despite the City Council's findings in the previous Smith application and despite the recommendation by the Planning and Building Director, the Planning Commission declined to grant or conditionally grant the plaintiff's application for a conditional use permit. Instead, the Planning Commission, over plaintiff's objection, postponed their decision for one month in violation of Section 17.57.110 of the Westminster Municipal Code. Following the continuance by the Planning Commission, the plaintiff requested a *de novo* review by the City Council, as authorized by section 17.57.120 of the Westminster Municipal Code.

Prior to the City Council's hearing on February 22, 1994, the City's Planning and Building Director issued a new report recommending that the conditional use permit be denied. The findings contained in the February 22, 1994 report directly conflict with several of the findings in the January 24, 1994 report, as set forth below:

| February 22, 1994 Findings | January 24, 1994 Findings |
| --- | --- |
| The proposed adult business is of a type that has been well documented by qualified persons, and in case law, as creating secondary adverse effects on surrounding properties, such as criminal activity, blight and degradation of the commercial district. The existing business has generated a large number of calls for police services, involving noise disturbances, fights, assaults, robberies, drug dealing and public inebriation. The present management of the existing nightclub business will continue in that capacity for the proposed adult cabaret. In view of the extensive police activity at the location during the present management's tenure, which is of a greater amount than for any other similar establishment in the city, it is reasonable to expect that the management will be no more able to control the undesirable activities that generate calls for police service under the new business than it did under the old one. Accordingly, the finding required under Section 17.57.160(8) cannot be made. | Staff is concerned that, based upon documented information concerning the adverse secondary effects that result from adult businesses of this nature, that there be adequate on-site security to prevent those secondary effects from occurring. Therefore, we suggest that the applicant be required to provide full-time security personnel within the parking area during all hours that the business is open. In addition, we also feel that it is necessary and appropriate that the applicant provide full-time security within the building to insure that calls for police service are kept to a minimum.<br><br>. . .<br><br>The security measures stipulated by this permit should mitigate the adverse secondary effects that might result from the operation of an adult use establishment. |
| The proposed use has a potential seating capacity for over 331 persons, while the available parking is only 76 spaces. The Traffic Bureau of the Police Department has indicated that the present Marquee nightclub, which has fewer seats, experiences severe parking problems, typically on weekends, and that patron parking extends onto the adjacent commercial properties, across Garden Grove Boulevard on the shoulder, and into nearby residential areas. The street adjacent to the Marquee becomes very congested and traffic accidents are common.<br><br>. . .<br><br>Based upon police experience with the existing business and the intensification of activity expected to occur with the proposed business, | There are 231 seats shown on the attached floor plan, plus a considerable amount of couch seating that could potentially accommodate up to 100 more additional patrons, for a total seating capacity in excess of 331 people.<br><br>. . .<br><br>The parking requirement for a free-standing nightclub or restaurant is 10 spaces plus one space for every 100 gross square feet of floor area. As the building contains 6484 square feet of gross floor area, the parking requirement is 75 parking spaces. The site plan shows that 76 spaces are provided, so the parking requirement is met. |

1358

there is substantial evidence to indicate that there is inadequate on-site parking available to serve the proposed use, and as a consequence, the finding required by Section 17.57.160(2) as it relates to parking cannot be made.

---

The present business is licensed to serve beer and wine only, whereas the proposed business will serve beer, wine and spirits. In view of the documented large numbers of police calls for disturbances, assaults and fights involving inebriated patrons, the addition of spirits to the existing beer and wine service is an unacceptable intensification of the business.

Full alcoholic beverage service will be provided, including distilled spirits, mixed drinks and beer and wine.

. . .

The design of the interior, *as conditioned*, will satisfy the requirements of the adult use regulations and should serve to mitigate the adverse secondary effects that might result from the operation of an adult use establishment.

---

The proposed new General Plan contains a policy which stipulates that commercial and industrial developments shall be required to clearly demonstrate that they will have no significant detrimental impacts upon the City and its residents, including significant adverse traffic, noise, air pollution and fiscal impacts. The proposed business will exacerbate an existing traffic and parking problem related to the existing use by virtue of the fact that the new business will be an intensification of the use, as it will be providing additional seating and adult entertainment. Therefore, the finding required under Section 17.57.160(1) cannot be made.

The proposed use is consistent with the General Plan commercial use criteria.

---

The proposed design of the parking facilities for the requested business contains a landscaping deficiency of approximately 1700 square feet. Therefore, the finding required by Section 17.57.160(2) as it relates to landscaping cannot be made.

Although the applicant's project data show that they meet the minimum landscape area of 10,-020 square feet, they are actually deficient by approximately 1.7 percent, or about 1700 square feet. It does appear that there is adequate area on the property to satisfy the entire landscape requirement, and no deviation to the landscape requirement is therefore justified.

. . .

The size and shape of the property provides adequate area to satisfy all commercial development requirements.

---

The condition of the property, which is characterized by severely deteriorated pavement, absence of landscaping, and poor building maintenance and appearance, results in blight and consequently impairs property values in the area. As the same management who has operated the business for the last several years and has allowed the property to deteriorate to its present condition will also operate the proposed business, it is reasonable to expect that these blighted conditions will not be significantly corrected in the future, or if corrected, will not be maintained. Therefore, the finding required by Section 17.57.160(9) cannot be made.

The exterior of the building is proposed to be renovated into a Mediterranean style, featuring low arches, parapet roof extensions, and new stucco coating. The colors are intended to be pastel pinks and beiges. A color accent band will be installed at the natural roofline below the parapet extensions, and at the arch line. The colors will be red or burgundy. A fawn awning will be placed around the waiting lobby area. A lighted cut-out letter building-mounted sign will be installed on the north (Garden Grove Blvd) frontage below the parapet roof line. There is presently a nonconforming pole sign in the front setback area of the property which will remain, but a new sign face will be installed. As no structural alterations to the

sign are proposed, it may remain on the site. It was the determination of the Design Review Committee that the proposed facade treatment met the terms of the Design Guidelines.

---

Traffic accident records for the years 1991 through 1993 for the portion of Garden Grove Boulevard between Edwards Street and Goldenwest Street (which contains the Marquee) shows that during the hours when the Marquee is typically open—9 p.m. to 2 a.m.—an abnormally high number of traffic accidents occur. As the only source of traffic is patrons of the Marquee, the majority of accidents can be attributed to them. Therefore, the finding required by Section 17.57.160(3) cannot be made.

<No equivalent finding>

---

■ The findings and conclusions contained in the February 22 Report are significantly different than those contained in the January 24 Report. At trial, Mr. Bouvier testified that the differences were based upon new information brought to his attention in the intervening month. The Court finds that this explanation is not credible. After hearing the testimony presented at trial, the Court concludes that the findings as articulated in the February 22 Report were motivated by the desire to prevent a topless bar from opening anywhere in the City rather than being based upon an objective application of the criteria set forth in Section 17.57.160 of the Westminster Municipal Code.

On February 22, 1994, the City Council held a *de novo* hearing and denied the CUP application. The following written findings, which were issued by the City Council on March 8, 1994 through Resolution No. 3148, directly conflict with the City Council's previous findings in relation to the property's appropriateness for an adult cabaret:

Resolution No. 3148 (Santa Fe Springs)

The proposed site is not adequate in size and shape to accommodate the landscaping requirements prescribed in the Municipal Code or as required in order to integrate the proposed use with the surrounding area. The applicant proposed to landscape an area which is located within the Flood Control District's twenty (20) foot wide easement located on the east side of the subject property. This is impermissible as the applicant has failed to provide any evidence that it has any legal authority to encroach onto the District's easement. Further, the City landscape requirements require a perimeter landscaping of five (5) feet while the offered plan is only three (3) feet wide. The applicant is therefore deficient by 1700 square feet to meet the City's landscaping requirements.

. . .

The proposed site is not adequate in size and shape to accommodate the parking requirements or as required in order to integrate the proposed use with the surrounding area. The site has experienced a history of severe parking

Resolution No. 2944 (Smith)

That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping, and other development features prescribed in the Municipal Code or as otherwise required in order to integrate said use with the uses in the surrounding area in that condition nos. 1, 2(a), 2(b), 2(c), 2(d), 3, 4, 5, 7, 8, 9, and 10, and each of them, attached to this approval, serve to integrate the use with the surrounding area.

problems resulting in patron parking overflowing onto adjacent commercial properties, onto the unpaved shoulder of Garden Grove Boulevard to the north and into the residential tract located to the west. Accidents have occurred as a result of patrons crossing Garden Grove Boulevard. The parking problems at the site are impacted further because of the poor condition and design of the parking facilities and the placement of the building on the site in such a manner to create a narrow passage on the east side of the building.

---

The proposed site is not adequately served by streets of sufficient width and improved as necessary to carry the kind and quality of traffic that such an adult use facility would generate. The traffic data for the period 1991 through 1993 for the portion of Garden Grove Boulevard between Edwards Street on the west and the 22 Freeway off-ramp on the east, which area includes the subject property, revealed an abnormally high number of auto accidents. This stretch of Garden Grove Boulevard primarily services the residential areas located west of Goldenwest. and accordingly, there should be little home-bound traffic during the hours of 9:00 p.m. and 2:00 a.m. These hours are the typical business hours for the Marquee and accordingly, the majority of accidents can be attributed to this facility. The proposed use including an intensification of the existing use will only serve to continue and/or increase the noted traffic problems.

The proposed site is adequately served by highways or streets of sufficient width and improvement in that the proposed use is the conversion of an existing facility and does not propose to add any additional seating capacity;

---

The proposed exterior appearance of the structure will not be consistent with the external appearances of commercial structures already constructed within the immediate neighborhood and will cause blight or deterioration of the property values within the neighborhood. The existing facility presently has severely deteriorated pavement, no landscaping, and poor building maintenance and appearance as illustrated by the photographs. It is reasonable to conclude with the same operator and an intensification of use that these problems will continue.

The exterior appearance of the structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight or deterioration or substantially diminish or impair property values within the neighborhood, in that condition nos. 1, 2(a), 2(b), 2(c), 2(d), 3, 4, 5, 7, 8, 9, and 10, and each of them, attached to this approval, serve to improve and maintain the exterior appearance of the structure.

---

The existing pole sign located on the site which is proposed to be re-faced does not comply with the City's Design Guidelines as it exceeds the height limitation and pole signs are not permitted.

<No equivalent finding>

---

The proposed adult use facility is not consistent with the City's proposed General Plan policy which states that commercial and industrial developments shall be required to clearly demonstrate that they will have no significant detrimental impacts upon the City and its residents,

The proposed use is consistent with the General Plan of the City, any other adopted plan of the city, or the adopted plan of any other governmental agency in that the subject property is designated as "Commercial" by the Land Use Element of the City's General Plan,

including significant adverse traffic, noise, air pollution, and fiscal impacts. The proposed use will exacerbate an existing traffic and parking problem related to the present use by virtue of the fact that the new use will be an intensification, as it will be providing additional seating at the facility. Further, the applicant's representative, Bob Martin, is the present operator of the existing facility commonly known as the Marquee nightclub. The calls for police service evidenced at the Marquee are excessively high for an establishment of this nature and it is reasonable to conclude with the same operator and an intensification of use that these problems will only continue, if not worsen. Further, fiscal impacts to the City and the impacts of noise and parking are significantly adverse.

and that conditions nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and each of them, attached to this approval, serve to or will bring the proposed use into consistency with the Land Use, Noise, Circulation, and other elements of the General Plan;

---

Although the City Council's previous findings are not binding in this case, they are relevant for determining whether the reasons articulated by the City Council for denying the plaintiff's application are pretextual. After hearing the testimony presented at trial, the Court concludes that the City Council had an insufficient factual basis to support the findings contained in Resolution No. 3148. Based upon all of the evidence submitted at trial, the Court finds that the denial of the permit constituted an abuse of discretion by the City Council because the plaintiff satisfied the permit approval criteria of Chapter 17.57.160 of the Westminster Municipal Code. Specifically, the Court finds that:

1. The proposed use is consistent with the Westminster General Plan. The City Council, in denying the permit, relied upon a *proposed* General Plan policy which had not been adopted by the City. This was improper because 17.57.160(1) is limited to plans that have been adopted by the City.

2. The proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping, and other development features prescribed in the Municipal Code or as otherwise required in order to integrate said use with the uses in the surrounding area. The City Council previously concluded that the site at 7000 Garden Grove Boulevard meets this requirement, and the evidence presented at trial demonstrates that the property is appropriate for an adult use. The site, as renovated, satisfies each of the requirements listed in Chapter 17.57.160(2). The parking lot, surrounding landscaping, building and other facilities have been substantially improved to integrate the proposed use with the uses in the surrounding area.

3. The proposed site is adequately served by highways or streets of sufficient width and improved as necessary to carry the kind or quantity of traffic that such use would generate. Although the testimony presented at trial in relation to this requirement was relatively weak, the Court concludes that the highways and streets serving 7000 Garden Grove Boulevard are adequate to carry the kind and quantity of traffic that the use will generate. Because the plaintiff's adult cabaret will feature continuous entertainment rather than special events at scheduled times, the Court concludes that the traffic generated by the adult use will be less than that generated by the Marquee Nightclub when it was in operation.

4. The proposed site is adequately served by other public and private service facilities. The City Council did not rely

upon this criterion when it denied the plaintiff's application.

5. The requested use at the proposed location does not adversely affect the use of a church, temple, or other place used exclusively for religious worship; school, park, playground, mobile home park, or similar use within a 250 foot radius. The City Council did not rely upon this criterion when it denied the plaintiff's application.

6. The requested use at the proposed location is not located within a 250 foot radius of any residential zone.

7. The requested use at the proposed location is not located within 250 feet of any other regulated use under this chapter.

8. The requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect such areas. The City Council did not rely upon this criterion when it denied the plaintiff's application.

9. The exterior appearance of the structure is not inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight or deterioration or substantially diminish or impair property values within the neighborhood. The site, as renovated, satisfies each of these requirements. The property to the immediate west is occupied by a nonconforming auto dismantling business, and the property farther to the west is occupied by a mini-warehouse. To the east is an equipment rental and storage yard, with more commercial uses farther east. To the south are three nonconforming residences on a site that has been recently approved for the development of two warehouse buildings. To the southwest of the property is a Southern California Edison substation.

10. The signs posted at the business conform to the regulations established in chapter 15.40 (sign code) and chapter 17.67 (Redevelopment Design Standards) of the Municipal Code.

Based upon the foregoing, the Court concludes that the City Council abused its discretion by denying the plaintiff's CUP application. The Court finds that the City Council applied improper criteria and articulated pretextual reasons when it denied the CUP application. The City Council should have conditionally approved the plaintiff's application, as recommended in the January 24, 1994 report from the City's Planning and Building Director. The proposed site has been substantially improved, and all of the criteria of Chapter 17.57.160 have now been satisfied by the plaintiff.

■ Because all of the conditions necessary for the issuance of a CUP have been satisfied in this case, the Court hereby ORDERS that a permanent injunction shall issue requiring the City to issue a CUP to the plaintiff. Because the form of topless dancing presented by the plaintiff is protected by the First Amendment, and because the City Council abused its discretion in denying the conditional use permit to the plaintiff, the Court concludes that the denial of the permit impinged upon the plaintiff's First Amendment rights.

## C. FACIAL CHALLENGES TO THE CITY'S ADULT USE ORDINANCES

### 1. Law Applicable to Facial Challenges

■ Because nude or semi-nude dancing is a form of expression protected by the First Amendment, the government cannot regulate the speech element of this activity on the basis of content.[3] *City of Renton v. Playtime Theatres,* 475 U.S. 41, 47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29, *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986); *Dease v. City of Anaheim,* 826 F.Supp. 336, 341 (C.D.Cal.1993).

■ If a "time, place, and manner" restriction on speech is based solely on the content of that speech, it presumptively vio-

---

**3.** The Constitution prohibits the government from granting the use of a forum to people whose views it finds acceptable, but denying the use of that forum to those wishing to express less favored or more controversial views. *Renton,* 475 U.S. at 47, 106 S.Ct. at 929.

lates the First Amendment. *Renton,* 475 U.S. at 46–47, 106 S.Ct. at 928–29. However, content-neutral "time, place, and manner" restrictions are acceptable so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication. *Id.*

 Zoning ordinances designed to combat the undesirable secondary effects of adult businesses are to be analyzed under the standards applicable to content-neutral "time, place and manner" regulations. *Renton,* 475 U.S. at 49, 106 S.Ct. at 930. In the *Renton* case, the Supreme Court upheld a zoning ordinance that prohibited adult movie theatres from locating within 1000 feet of any residential zone, single or multiple family dwelling, church, park, or school. *Id.* at 43, 106 S.Ct. at 926–27. After acknowledging that adult use ordinances do not fit neatly into either the "content-based" or the "content-neutral" category, the Court concluded that the "content-neutral" analysis may be applied to an adult use ordinance which was enacted out of concern for secondary effects rather than to suppress free expression. *Id.* at 47, 106 S.Ct. at 929.

 In order for an adult use regulation to be upheld by the court, it must be designed to serve a substantial governmental interest and must allow for reasonable alternative avenues of communication. *Id.* at 50, 106 S.Ct. at 930. In the *Renton* case, the ordinance was upheld because it served a substantial governmental interest and because the City allowed adult businesses to operate in locations comprising more than 5% of the city's entire land area.[4] *Id.*

 In a later case involving public nudity, *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), the Supreme Court applied a slightly different test which embodies the same standards that the Court applied in *Renton.* The government regulation of an activity combining speech and nonspeech elements is sufficiently justified if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the governmental interest. *Id.* at 567, 111 S.Ct. at 2460–61 (*citing United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 *reh'g denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

In *Barnes,* the Court upheld an Indiana public indecency statute banning public nudity, even though the ordinance had the effect of prohibiting all nude dancing. The Court concluded that the Indiana law was intended to further a substantial governmental interest which was unrelated to the suppression of free expression. *Id.* at 569, 111 S.Ct. at 2462. The Court also found that the incidental restriction on First Amendment freedoms was not greater than was essential to further the governmental interest because other erotic performances could be presented at adult nightclubs without interference from the state so long as the performers wore a scant amount of clothing. Because Indiana law did not proscribe semi-nude dancing, reasonable alternative avenues of communication existed to convey the erotic message through dance.

## 2. Law Applicable to Conditional Use Permits

 In determining the constitutionality of a conditional use permit ordinance, the court must engage in a second level of analysis beyond the *O'Brien* test and deal with the issue of prior restraints. *Dease v. City of Anaheim,* 826 F.Supp. 336, 342 (C.D.Cal. 1993). Unlike the statute at issue in *Barnes,* which simply bans public nudity, a CUP ordinance acts as a prior restraint on speech. *Id.* A CUP scheme qualifies as a prior restraint because it essentially requires the permittee to obtain the government's permis-

---

**4.** This area consisted of 520 acres of "ample, accessible real estate," including "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that [was] criss-crossed by freeways, highways, and roads." *Renton,* 475 U.S. at 53, 106 S.Ct. at 932.

sion or approval before engaging in an act of First Amendment protected speech. *Id.*

■ Although prior restraints are not unconstitutional *per se,* any system of prior restraint bears a heavy presumption against its constitutional validity. *Dease,* 826 F.Supp. at 342 (*citing FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990)). A system that endows a government official with unbridled discretion to determine who may speak and who may not implicitly vest that governmental official with the power to regulate speech on the basis of its content and/or the viewpoint of the speaker. *Dease,* 826 F.Supp. at 342 (citing *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 763–64, 108 S.Ct. 2138, 2147–48, 100 L.Ed.2d 771 (1988)).

■ The Supreme Court has repeatedly struck down ordinances that make the enjoyment of constitutionally guaranteed freedoms contingent upon the uncontrolled will of an official. *Dease,* 826 F.Supp. at 343 (*citing FW/PBS,* 493 U.S. at 226, 110 S.Ct. at 605; *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969)). A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license or permit must be declared unconstitutional unless it contains narrow, objective, and definite standards to guide the licensing authority. *Id.*

The *Dease* case involved the facial validity of the City of Anaheim's conditional use permit ordinance that applied to adult businesses. Following a court trial, the CUP scheme was declared to be facially unconstitutional. The court concluded that the CUP scheme was invalid because the Planning Commission was vested with an unconstitutional amount of discretion in deciding whether to grant or deny the CUP, leaving open the possibility of content-based discrimination. *Dease,* 826 F.Supp. at 344.

Because the Anaheim Planning Commission's decision-making was not guided by definite and objective standards, the *Dease* court held that the CUP ordinance infringed upon the First Amendment rights of the permittee. *Dease,* 826 F.Supp. at 344. Under the Anaheim ordinance, a CUP could be denied if the Commission found that the adult business would "adversely affect" the use of a church, school, park or playground; if the adult business was "insufficiently buffered" in relation to residential areas; or if the business' exterior appearance was "inconsistent" with the appearance of external structures in the neighborhood. *Id.* These standards are both too vague and too subjective to stand.

■ In order for a conditional use permit licensing scheme to be valid, the regulatory scheme must contain narrow, objective and definite standards which eliminate any possibility for content-based censorship.

### 3. Statute of Limitations

■ All actions brought under § 1983 of the United States Code are subject to a one-year statute of limitations. *Barancik v. County of Marin,* 872 F.2d 834 (9th Cir. 1988), *cert. denied,* 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 193 (1989). The statute of limitations begins to run when the plaintiff knows, or reasonably should know, of the alleged injury. *Gibson v. United States,* 781 F.2d 1334 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).

■ In a takings case, the alleged injury occurs on a discrete date, and the statute of limitations begins to run on the date of enactment of the statute or ordinance (i.e., the date the taking occurs). *De Anza Properties X, Ltd. v. County of Santa Cruz,* 936 F.2d 1084, 1087 (9th Cir.1991). A § 1983 plaintiff alleging an unconstitutional taking is precluded from bringing a claim more than one year after the taking occurs. *Id.*

■ The Court refuses to apply the rule applicable in takings cases to the plaintiff's facial challenge to Ordinance No. 2172 because the nature of the injury in a First Amendment case differs from that in a takings case. A First Amendment challenge such as the one brought in the present case involves a continuing injury based upon the statute's on-going effect on protected speech.

Because strong policy reasons militate in favor of permitting facial challenges to stat-

utes that impinge upon protected First Amendment rights, the statute of limitations should not preclude a plaintiff from bringing a facial challenge more than one year after the statute's enactment. The Courts have developed a variety of doctrines that encourage litigants to challenge statutes which chill First Amendment protected speech. *See, e.g., Lakewood,* 486 U.S. at 755–56, 108 S.Ct. at 2142–43. In *National Advertising Company v. City of Raleigh,* 947 F.2d 1158, 1168 (4th Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992), the court underscored this position and wrote that "it is doubtful that an ordinance facially offensive to the First Amendment can be insulated from challenge by a statutory limitations period."

A facial challenge may be the only effective way to challenge an ordinance which chills First Amendment speech. In a case that involved a licensing statute and its potential limits on free expression, the Supreme Court noted that "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint.... These evils engender identifiable risks to free expression that can be effectively alleviated *only through a facial challenge.*" *Lakewood,* 486 U.S. at 757, 108 S.Ct. at 2144 (1988) (emphasis added).

Based upon the foregoing, the Court refuses to hold that the one-year statute of limitations prohibits a facial challenge to Ordinance No. 2172.

#### 4. Ordinance No. 2172

A CUP ordinance for adult businesses must contain criteria which are sufficiently narrow, objective and definite so as to eliminate any possibility for content-based censorship. Because the criteria for denying a CUP under Ordinance No. 2172 are vague and ambiguous, the Court now holds that the ordinance fails to effectively limit the discretion vested in the licensing officials.

In the *Dease* case, the Court struck down the CUP ordinance because it contained vaguely-worded criteria. *Dease,* 826 F.Supp. at 344. The Court finds that the following portions of Ordinance No. 2172, as codified in Chapter 17.57 of the Westminster Municipal Code, are similarly flawed:

(1) that the proposed site is "adequate in size and shape" to accommodate the yards, walls, fences ...;

(2) that the requested use at the proposed location will not "adversely affect" the use of a church, temple ...;

(3) that the requested use at the proposed location is "sufficiently buffered" in relation to residentially zoned areas ...; and

(4) that the exterior appearance of the structure will not be "inconsistent with" the external appearance of commercial structures....

The Planning Commission and City Council's ability to make determinations based upon the vague criteria set forth above vests the City with an unconstitutional amount of discretion. The City may impose distancing and dimensional limitations based upon objective measurements and may require the proposed site to comply with all generally applicable building and zoning codes as they relate to exterior appearance. The ambiguous criteria set forth in Ordinance No. 2172 constitutes an unconstitutional prior restraint because the vague wording leaves open the possibility of content-based censorship.

In reaching this decision, the Court does not intend to embrace the view that a CUP ordinance cannot vest the City Council or the City Planning Commission with some degree of discretion. Because of the limitations inherent in statutory drafting, a CUP ordinance is likely to place some degree of constitutional discretion in the hands of the City's licensing officials. However, the licensing official's discretion must be limited by narrow, objective and definite criteria which eliminate the possibility of content-based discrimination.

#### 5. Ordinance No. 2233

On January 10, 1995, the City amended portions of Chapter 17.57 of the Westminster Municipal Code through Ordinance No. 2233. Although Ordinance No. 2233 removes some of the vague and ambiguous criteria set forth in Ordinance No. 2172, some portions of the adult use ordinance continue to vest the City

**1366**

Council and the Planning Commission with an unconstitutional amount of discretion.

### a. Permit Approval Criteria

■ Sections 17.57.160(2) and 17.57.160(5), as amended by Ordinance No. 2233, are constitutional because they contain narrow, objective and definite criteria for denying the conditional use permit application. Section 17.57.160(2) provides "[t]hat the proposed use complies with the development and design requirements of the zone or land use designation in which it is to be located." This section replaces the previous requirement that the proposed site be "adequate in size and shape to accommodate the yards, walls, fences...." The Court finds that Section 17.57.160(2), as amended, passes constitutional muster. Section 17.57.160(5), as amended, provides that "[t]he requested use at the proposed location will not be located within a 250 foot radius of a church, temple...." This section replaces the requirement that the requested use "will not adversely affect the use of a church, temple...." This amended section is also sufficiently narrow, objective and definite to pass constitutional scrutiny.

Sections 17.57.160(1), 17.57.160(3) and 17.57.160(4) remain unconstitutionally vague because they contain ambiguous criteria that fail to effectively limit the discretion vested in the licensing officials.

■ Section 17.57.160(1) requires the proposed use to be "consistent with the Westminster General Plan, any other applicable adopted plan of the city, or any applicable adopted plan of any other governmental agency." In this case, the City attempted to rely upon a "proposed" plan that would have required the plaintiff to "clearly demonstrate" that its establishment would have "no significant detrimental impacts upon the City and its residents." In the context of the plaintiff's *as applied* challenge, the Court rejected this basis because the City Council relied upon a "proposed" plan, rather than an adopted plan. A "proposed" plan, of course, is no plan at all. The "proposed" plan demonstrates that the vague criteria set forth in 17.57.160(1) are unconstitutionally ambiguous because the City could theoretically adopt a plan that denies adult businesses a reason-

able opportunity to open and operate their businesses within the City of Westminster. Therefore, the Court declares that the criteria set forth in 17.57.160(1) are unconstitutionally infirm.

■ Section 17.57.160(3) also contains vague and ambiguous criteria which fail to effectively limit the possibility of content-based censorship. Section 17.57.160(3) requires that the proposed site is "adequately served by highways or streets of sufficient width and improved as necessary to carry the kind or quantity of traffic that such use would generate." The terms "adequately served," "sufficient width," and "improved as necessary" are unconstitutionally vague.

Section 17.57.160(4) requires that the proposed site be "adequately served by other public and private service facilities as are required." The term "adequately served" is unconstitutionally vague.

### b. Conditional Approval

■ Under Section 17.57.160, the Planning Commission or City Council shall approve or conditionally approve an application where the information submitted by the applicant substantiates that all of the enumerated criteria are satisfied. Section 17.57.160, however, places no limitation upon the conditions which may be imposed in conjunction with a conditional approval. If the ordinance were to be read so that the Planning Commission or City Council could place any condition on the project, without limitation, the ordinance would undoubtedly constitute an unconstitutional prior restraint. In an effort to avoid an unconstitutional interpretation of the statute, the Court construes the statute to allow only those conditions which are required by one or more of the valid criteria enumerated in the Code. For example, if the proposed site were to meet all of the criteria except for a regulation established in the sign code, then the application should be conditionally approved, and the plaintiff should be required to modify its sign to meet the Code requirements.

In order to avoid an unconstitutional interpretation of the statute, the Court concludes that 17.57.160 should be interpreted in a

manner which limits the conditions which may be imposed in conjunction with a conditional approval. The conditions which may be imposed must be limited to changes that bring the proposed use in conformity with a valid requirement set forth in the criteria enumerated in the section.

### c. Expiration and Renewal Provisions

██ Section 17.57.140 provides that the conditional use permit automatically expires after five years. Section 17.57.150 requires the adult use to renew its conditional use permit application every two years. Upon receipt of the renewal application, the Planning Commission and/or the City Council are required to hold a public hearing to determine whether a new conditional use permit should issue. Following the public hearing, the Planning Commission and/or the City Council may impose new conditions on the adult business, and the new conditions are not limited in any manner by the terms of the ordinance. The automatic expiration and renewal provisions constitute an unconstitutional restriction on the plaintiff's First Amendment rights. Therefore, the Court holds that the conditional use permit expiration and renewal provisions of Sections 17.57.140 and 17.57.150 place an unconstitutional restriction on the adult use.

### d. Revocation Provisions

██ Because some of the permit revocation provisions contained in Section 17.57.170 do not contain narrow, objective and definite criteria for revoking the permit, the Court concludes that the vague and ambiguous portions are unconstitutional. Section 17.57.170(A)(6) allows revocation if "[t]he building or structure in which the adult business is conducted is *hazardous to the health or safety* of the employees or patrons of the business or the general public under the standards set forth in the Uniform Building, Uniform Plumbing, or Uniform Fire Codes." This section is unconstitutionally vague and ambiguous. Section 17.57.170(A)(8) allows revocation if "[t]he security measures provided by the permittee are *inadequate to deter* unlawful conduct on the part of the employees or patrons, or *to promote the safe and orderly* assembly and movement of persons and vehicles, or *to prevent disturbance* of the neighborhood by excessive noise...." This section is also unconstitutionally vague and ambiguous.

The explicit language of Section 17.57.170(F) places no limitations on the conditions which can be imposed on an adult use following a revocation hearing. In an attempt to avoid an unconstitutional interpretation of the Ordinance, the Court determines that the conditions which may be imposed under 17.57.170(F) are limited to the valid criteria listed in 17.57.170(A).

### e. Severability of Invalid Provisions

██ Ordinance No. 2233 contains a severability clause which allows the Court to remove the broad, indefinite or ambiguous portions of the Ordinance while leaving the remaining portions of the statute in effect. Section 5 of Ordinance No. 2233 provides: "If any section, subsection, sentence, clause, phrase or word of this Ordinance is for any reason held to be invalid by any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have passed and adopted this Ordinance, and each and all provisions hereof, irrespective of the fact that one or more provisions may be declared invalid." Based upon the express language of this severability clause, the Court finds that all of the remaining sections of Chapter 17.57 shall remain valid and in effect after this decision. The unconstitutional portions, however, are declared to be invalid.

The following sections of Chapter 17.57 are invalid for the reasons set forth above: Section 17.140, Section 17.150, Section 17.160(A)(1), Section 17.160(A)(3), Section 17.160(A)(4), Section 17.170(A)(6), and Section 17.160(A)(8).

Furthermore, the Court declares that the conditions imposed when conditionally granting the permit under Section 17.57.160, or when conditionally revoking the permit under Section 17.57.170, must be limited to the objective criteria enumerated in the statute.

**1368**

The above memorandum constitutes the Court's Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

### JUDGMENT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the memorandum of decision and order filed herewith, the court orders that a permanent injunction shall issue requiring the defendant City of Westminster to issue a Conditional Use Permit to plaintiff. The Court further holds that City Ordinance Number 2172 and certain portions of City Ordinance Number 2233, as enumerated in the memorandum of decision, are unconstitutional under the First Amendment. The Court orders that such judgment be entered.